PRENALTA CORPORATION, a Florida corporation; Spelman Prentice, an individual; James A. Masterson, an individual; Frederick R. Hickok, as Executor of the Estate of Clifford P. Hickok, Deceased; Ellis W. Manning, Jr., an individual; Elmer S. Parson, Jr., an individual; Gordon Van Fossen, an individual; Doris F. Johnson, an individual; Roland W. Hart, an individual; J. Adrian Padon, an individual; Gary Van Fossen, an individual; Frederick R. Hickok, an individual; and William C. Hickok, an individual, and the Spelpren Company, Plaintiffs–Appellants,

v.

COLORADO INTERSTATE GAS COMPANY, a Delaware corporation, Defendant–Appellee.

No. 90–8005.

United States Court of Appeals, Tenth Circuit.

Sept. 4, 1991.

As Amended on Denial of Rehearing Dec. 6, 1991.

J. Alan Galbraith of Williams & Connolly, Washington, D.C. (Gretchen VanderWerf of Hawley & VanderWerf, Denver, Colo., with him on the brief), for plaintiffs-appellants.

Jeffrey M. Goldsmith, Colorado Interstate Gas Co., Colorado Springs, Colo. (William J. Hornbostel and Rebecca H. Noecker of Colorado Interstate Gas Co., Colorado Springs, Colo., and Marilyn S. Kite of Holland & Hart, Cheyenne, Wyo., with him on the brief), for defendant-appellee.

Before HOLLOWAY, Chief Judge, TACHA, Circuit Judge, and BRETT, District Judge.*

BRETT, District Judge

This diversity action arises out of a series of six gas purchase contracts between the sellers, Prenalta Corporation, twelve individuals,[1] and The Spelpren Company, who own working interests in various natural gas wells located in Sweetwater County, Wyoming ("Prenalta"), and the buyer, Colorado Interstate Gas Company ("CIG"), an interstate gas pipeline company. Prenalta brought this action for declaratory relief against CIG concerning the price of deregulated gas under Contracts 422 and 516, and for damages due to breach of the "take-and-pay" clauses under Contracts 321, 323, 324, 327 ("300 Series Contracts") and the "take-or-pay" clauses under Contracts 422 and 516. CIG counterclaimed for declaratory judgment as to the price of deregulated gas under Contracts 422 and 516 and for restitution of payments made to Prenalta in excess of that required under Contracts 422 and 516. The parties agree that the law of Wyoming applies to this dispute.

On cross-motions for partial summary judgment, the district court found in favor

---

* The Honorable Thomas R. Brett, United States District Judge for the Northern District of Oklahoma, sitting by designation.

1. Spelman Prentice, James A. Masterson, Frederick R. Hickok, individually and as executor of the Estate of Clifford P. Hickok, deceased, Ellis W. Manning, Jr., Elmer S. Parson, Jr., Gordon Van Fossen, Doris F. Johnson, Roland W. Hart, J. Adrian Padon, Gary Van Fossen, and William C. Hickok.

of CIG on the price of deregulated gas, holding that CIG was obligated to pay the escalated base price for deregulated gas under Contracts 422 and 516. Prenalta does not appeal this ruling. The district court also granted CIG's second motion for partial summary judgment holding that CIG was entitled to a refund of payments made since January 1, 1985 in excess of the escalated base price for deregulated gas under Contracts 422 and 516, totaling $1,100,032.99, and that Prenalta was precluded from recovering damages for the alleged breach of CIG's take-and-pay obligations under the 300 Series Contracts and CIG's take-or-pay obligations under Contracts 422 and 516 because Prenalta failed to plead the proper measure of damages.

Prenalta presents the following issues on appeal:

(1) Is CIG entitled to a refund of money paid after January 1, 1985 in excess of the escalated base price for deregulated gas under Contracts 422 and 516?

(2) What is the proper measure of damages for breach of the take-or-pay clauses of Contracts 422 and 516? and

(3) What is the proper measure of damages for breach of the take-and-pay clauses of the 300 Series Contracts?

Prenalta contends that as to (1) there are at least controverted issues of material fact, and as to (2) and (3), the trial court erroneously determined the measure of damages and erred in not permitting Prenalta to proceed with a trial on the merits, whatever the proper measure of damages.

For the reasons set forth below, the summary judgment of the district court in favor of CIG is vacated and the case is remanded for jury trial consistent with this opinion.

## BACKGROUND

The Prenalta parties are the owners of working interests in approximately thirty gas-producing wells in Sweetwater County, Wyoming. CIG is an interstate gas pipeline company engaged in the business of purchasing, gathering, transporting and selling natural gas. From 1966 through 1973 Prenalta and CIG entered into six long-term contracts for the sale and pur-

chase of natural gas produced from Prenalta's wells—the 300 Series Contracts and Contracts 422 and 516 ("subject contracts"). As of the filing of this appeal, CIG continued to purchase natural gas from Prenalta under these contracts.

When the terms were negotiated and the subject contracts executed, the prices to be paid for gas produced under the contracts were regulated by the federal government—initially, the Federal Power Commission and later, the Federal Energy Regulatory Commission (FERC). The prices for gas under the 300 Series Contracts continue to be regulated by FERC. However, pursuant to Section 121 of the Natural Gas Policy Act of 1978 (NGPA), 15 U.S.C. § 3331, the price for gas sold from two of the wells under Contract 422 and from all of the wells under Contract 516 was deregulated on January 1, 1985. The regulatory environment within which these contracts were formed, therefore, is pertinent to an adequate understanding of the contracts' purpose and effect.

At the time Prenalta and CIG entered into the subject contracts, the regulatory price ceilings on natural gas sold in the interstate market had contributed to conditions of decreased production and, ultimately in the early 1970s, natural gas shortages. *Mobil Oil Exploration & Prod. S.E., Inc. v. United Distribution Co.,* —— U.S. ——, ——, 111 S.Ct. 615, 620, 112 L.Ed.2d 636 (1991) ("severe shortages persisted in the interstate market because low ceiling prices for interstate gas sales fell considerably below prices the same gas could command in intrastate markets, which were as yet unregulated"); Pierce, *Natural Gas Regulation, Deregulation, and Contracts,* 68 Va.L.Rev. 63, 67–68 (1982). During this period of limited supply, long-term gas purchase contracts became even more advantageous to the pipeline/purchaser. While the market and supply security of long-term contracts continued to be valuable to both producers and pipelines in attracting the required large capital investment associated with the cost of production and transportation of natural gas, long-term contracts further assured pipelines a continuous delivery of gas dur-

ing a time of shortage. *See Amoco Prod. Co. v. Stauffer Chem. Co.*, 612 P.2d 463, 468 (Wyo.1980); Pierce, *supra*, at 77–79. These factors were undoubtedly considered by Prenalta and CIG when they contracted in Article VI of the subject contracts to sell and buy gas for a "term of 20 years and so long thereafter as gas is capable of being produced in commercial quantities from the gas leases and gas rights committed to the performance of this Agreement."

Not only did regulatory price ceilings help create market conditions advantageous to the execution of long-term gas purchase contracts, but they also affected the negotiation of specific provisions of these contracts due to the limitation of price as a bargaining term. In order to compete in a market of limited supply, pipelines were forced to grant producers benefits other than price. Because the present allocation of the risk of future events is endemic to long-term contracts, producers negotiated price-substitute benefits which shifted the risk of a decline in market demand for natural gas to the pipelines through the contract inclusion of take-and-pay or take-or-pay clauses. *See generally* Pierce, *supra*, at 77–82.

Under a take-and-pay clause, the pipeline is required annually to take and pay for a minimum contract quantity of gas. A take-and-pay clause benefits the producer by maximizing revenue through the steady depletion of gas reserves. Johnson, *Natural Gas Sales Contracts*, 34 Inst. on Oil & Gas L. & Tax'n 83, 108 (1983). Under a take-or-pay clause, the pipeline is required annually to take and pay for a minimum contract quantity of gas *or* pay for a specified quantity. A take-or-pay clause differs from a take-and-pay clause in that it assures the producer a constant cash flow rather than the actual purchase of the contract quantity of gas over the term of the contract. Johnson, *supra*, at 110. In addition, a take-or-pay clause adds some measure of flexibility in a long-term gas purchase contract by allowing the pipeline to pay for a specified quantity in lieu of taking the contract quantity without endangering its long-term source of supply.[2] 4 H. Williams, *Oil and Gas Law* § 724.5, at 665 (1990). Under both provisions, however, the pipeline assumes the risk that a market for the contract quantity of natural gas might fail during the contract term. The take-and-pay provision in the 300 Series Contracts and the take-or-pay provision in Contracts 422 and 516 are typical of such clauses in the natural gas purchase contracts of the early 1970s.

While regulation of natural gas prices encouraged the formation of these long-term take-and-pay and take-or-pay contracts, deregulation encouraged their modification or breach. The enactment of the NGPA in 1978 permitted the gradual deregulation of natural gas which resulted in a dramatic rise in natural gas prices. The rise in natural gas prices, in turn, provided incentive for both energy conservation and for new gas exploration and, by the 1980s, natural gas supplies were abundant.[3] The supply of gas for which the pipelines initially contracted assumed a demand that no longer existed. Pipelines generally responded to these market conditions by renegotiating existing take-and-pay and take-or-pay contracts with producers, and, failing that, reducing gas "takes" by making payment only on gas that could be marketed, in breach of such contracts. Arbaugh, *Take or Pay Clauses: Pandora's Box Reopened?*, 5 E.Min.L.Inst. 11–1, 11–3 (1984). The issues in this case arise from the parties' failed attempt at such renegotiation

---

2. "Make-up" clauses were also customary provisions in take-or-pay contracts during the early 1970s. Section 4.2 of Contracts 422 and 516 provides that upon payment "for that quantity of gas which is equal to the difference between the Contract Quantity and Buyer's actual takes," CIG can "make-up" the gas paid for but not taken within the succeeding five years. The gas so credited is known as "make-up gas." 4 H. Williams, *Oil and Gas Law* § 724.5, at 665 (1990).

3. *Maryland People's Counsel v. FERC,* 761 F.2d 768, 771 (D.C.Cir.1985).

Factors ranging from the increased wellhead prices and impending total decontrol, to greater energy conservation, to the lower prices of competing fuels, have turned the natural gas shortages of the 1970's into a natural gas surplus.

*Id.*

and CIG's alleged breach of the subject contracts.

## I.

On June 22, 1983, CIG circulated an interoffice memo stating that a "[m]anagement decision has been issued not to make any further payments for take-or-pay claims." (P.Exh. 20). As a result of this decision, CIG sent a negotiation team in September 1983 to discuss with Prenalta possible modifications of existing contracts. On March 21, 1984, CIG submitted its first of a series of written proposals for renegotiation of the contracts which continued until the filing of this lawsuit.

On January 1, 1985 the price for gas from two of the wells under Contract 422 and from all of the wells under Contract 516 was deregulated. Prenalta and CIG had anticipated possible deregulation of gas by the time they executed the last of the subject contracts, Contract 516, in 1973, and had consequently contracted pricing provision § 5.1(d). The parties also incorporated this provision by amendment to Contract 422 in 1973. Section 5.1(d) provides that in the event of deregulation of the price of gas sold under the contract, Prenalta would have the right to request a redetermination of the price during the first six months after the date of deregulation and during the six-month period preceding each five year anniversary of the date of deregulation. Upon such request, the parties agreed to meet and determine a fair value of the gas.

On February 8, 1985 CIG mailed a form letter to all of its suppliers acknowledging that as of January 1, 1985, NGPA pricing "no longer applies to much of the gas CIG purchases under current contracts." (P.Exh. 5). In the letter, CIG alerted suppliers that the applicable price changes might be delayed due to the required review of the various pricing provisions of CIG's contracts, and that CIG retained the right to make any necessary retroactive adjustment for "a previous month or months."

It was sometime during February 1985 that CIG authorized a payment adjustment commencing on January 1, 1985 of $.51/Mcf[4] for Contract 422 gas and $.46/Mcf for Contract 516 gas based on CIG's assessment that the applicable price under the contracts was the escalated base price as set out in § 5.1(a) and (b). Although CIG paid Prenalta directly for gas purchased under Contract 422, CIG paid Prenalta indirectly through the operator, HPC, Inc., ("HPC"), for gas purchased under Contract 516 prior to January 1986. CIG implemented the escalated base price adjustment for gas purchased under Contract 516 in February 1985, but failed to adjust the price for Contract 422 gas at that time due to "administrative problems." HPC, however, continued to pay Prenalta at a rate of $2.78–$3.28/Mcf for Contract 516 gas until January 1986 due to confusion caused by CIG's settlement statements and HPC's accounting problems after deregulation.[5] Prenalta, therefore, was unaware of CIG's decision to adjust payments under Contracts 422 and 516, because CIG continued to pay Prenalta $3.93/Mcf for Contract 422 gas, and HPC continued to pay Prenalta at a rate of $2.78–$3.28/Mcf for Contract 516 gas.

CIG sent Prenalta two letters on March 8, 1985—one concerning Contract 516 wells and the other concerning two Contract 422 wells—explaining its position on pricing since deregulation: "Since there is no longer a regulated price and since the price for deregulated gas has not been redetermined as provided in Article V of the referenced contract, CIG intends to pay the applicable contract base price as of January 1, 1985." (Exhs. 1 & 2 to P.Exh. 1). The letters also offered $2.80/MMBtu[6] for deregulated gas if Prenalta would agree to modify the contracts to reduce CIG's take obligations and to forgive any past take-or-pay liability incurred by CIG.

---

**4.** "Mcf" is a thousand cubic feet—the standard unit for measuring the volume of natural gas.

**5.** Sometime after January 1986, HPC adjusted its payments to Prenalta to reflect the actual price paid by CIG.

**6.** An "MMBtu" is a million british thermal units. A "british thermal unit" is the "amount of heat needed to raise the temperature of one pound of water one degree Fahrenheit." H. Williams & C. Meyers, *Oil and Gas Terms* 99 (7th ed. 1987).

In a letter dated June 24, 1985, Prenalta responded to the March 8, 1985 letters, rejecting CIG's proposed modifications of Contracts 422 and 516 and asserting its disappointment with CIG's "failure to address the problem of gas deficiencies in takes that have occurred to date on all wells covered by our contracts." (P.Exh. 8). Prenalta further stated that "[a]lthough we recognize our unilateral right as seller to invoke the price redetermination procedure provided in Article 5.1(d) of our contracts, in the spirit of cooperation and to avoid, if possible, an adversary approach we hereby elect not to do so." [7]

Due to the confusion resulting from CIG's March 8, 1985 letters and Prenalta's continued receipt of commercially reasonable prices for both Contract 422 and 516 gas, Jim Masterson of Prenalta telephoned CIG Vice–President Glenn Bjustrom on June 12, 1985 and sent a follow-up letter on June 25, 1985 in an effort to determine the price CIG had been paying for deregulated gas under Contract 516. In these communications, Masterson listed the range of "apparent prices received" from HPC from January 1984 through March 1985, and requested a statement of the price paid for such gas. (P.Exh. 3). Although Bjustrom knew on June 25, 1985 that Prenalta was being paid only $.46/Mcf for Contract 516 gas,[8] he sent a letter to Masterson on July

19, 1985 listing "CIG's Btu and pricing history" of Contract 516 gas which ranged from $4.54 in September 1984 to $3.17 in May 1985, and advising that CIG's "company policy does not permit release of gas purchase statement data to parties other than the payee, which in this case is HPC, Inc." (Exh. 2 to P.Exh. 2). The letter concluded by stating that "[t]he ceiling price of NGPA Section 102 was effective until 1–1–85, when $2.80/MMBtu price became effective."

On July 22, 1985, Masterson wrote CIG acknowledging receipt of the July 19 letter "concerning the prices paid by CIG for gas from September, 1984 through May, 1985." (P.Exh. 27). Masterson, noting the difference in the prices paid by CIG and those received by Prenalta, stated that Prenalta would explore this problem and the matter of monthly statements with HPC but objected to CIG's refusal to submit the statements to Prenalta stating that "[o]ur contract clearly provides that we are entitled to such a monthly statement, and something will have to be done so that we can audit the price we are receiving for our gas." [9]

The next letter Prenalta received from CIG concerning the price of Contract 516 gas was sent on December 23, 1985. In this letter CIG stated that "there has been no applicable contract price as of January

---

7. The time period for Prenalta's initial redetermination of price under Contracts 422 and 516 expired on June 30, 1985.

8. As evidence of Bjustrom's knowledge, Prenalta offers the "smoking gun" memo in which Bjustrom recorded Masterson's telephone request for information. (P.Supp.Exh. A). In this internal memo, Bjustrom entered the "answers" to Masterson's request, dated June 25, 1985, stating that CIG was paying $.43/Mcf (actually $.46/Mcf) for Contract 516 gas, effective January 1, 1985.

CIG did not send Prenalta this document until Friday, November 16, 1989, preventing Prenalta from filing its supplemental brief with the document attached until Monday, November 20, 1989, two days before the district court granted CIG's motion for summary judgment. Prenalta asks that we "provide guidance that upon remand Prenalta should be allowed to amend its complaint to allege concealment, with revision of its evidence on damages to provide for additional compensatory and punitive damages."

It is evident from § 4.1 in the General Conditions Gas Purchase Agreement of Contract 516 that Prenalta, as buyer, had a right to the information requested by Masterson. CIG's failure to provide Prenalta with the price information, therefore, was in breach of Contract 516. However, we do not find that the evidence of the breach supports an action in tort.

9. Prenalta refers to section 4.1, entitled "BILLING," in the General Conditions Gas Purchase Agreement of Contract 516 which states the following:

On or before the 10th day of each month Buyer shall render to Seller a statement of the quantities of gas delivered to Buyer during the preceding month and the amount due from Buyer to Seller, less all applicable taxes paid by Buyer for Seller's account, according to the measurement terms, conditions, and prices herein provided.

1, 1985" since the price has not been redetermined. (P.Exh. 9). The letter further stated that "CIG has paid and will continue to pay, as the law requires, a commercially reasonable price pending determination of a price for your deregulated gas," and proposed "$2.15 per MMBtu as the price applicable to the deregulated gas sold under the referenced Contract, as now written, effective January 1, 1986."

It was not until the January 10, 1986 meeting between representatives of Prenalta and CIG that Prenalta discovered that CIG had been paying HPC only $.46/Mcf for Contract 516 gas since January 1, 1985. Prenalta wrote CIG a letter dated February 12, 1986 complaining that the information is "contrary to the advice previously given to us in your letter dated July 19, 1985 when you advised us that the price was approximately $3.17." (P.Exh. 4). The letter went on to present Prenalta's position that the escalated base price under § 5.1(a) and (b) was not the applicable price for deregulated gas which had not been redetermined. Prenalta cited CIG's December 23, 1985 letter which stated that the applicable price was the "commercially reasonable price" of $2.40 in lieu of redetermination, and demanded that CIG make immediate retroactive adjustment before Prenalta would continue attempts to renegotiate the contracts.

This letter was followed by Prenalta's proposed amendment to Contracts 422 and 516 on July 11, 1986. Prenalta, recognizing the "drastic changes" in CIG's gas markets, offered a 75% reduction in CIG's "take" obligation among other changes, but reiterated its demand of the payment of a commercially reasonable price for gas as suggested in CIG's December 23, 1985 letter. (CIG Exh. E.).

CIG agreed to Prenalta's demand and made a retroactive payment of $446,281 for the difference between the commercially reasonable price and the escalated base price for gas purchased under Contract 516 since January 1, 1985. CIG followed this payment with a letter two weeks later on September 5, 1986 acknowledging its agreement to increase retroactively the prices paid for Contract 516 gas from "approximately $.51 per Mcf to $2.40 and $2.15 per MMBtu, effective January 1 of 1985 and 1986, respectively," but with the following proviso:

> Understand that this increase in price was implemented by CIG as a good faith expression of our willingness to reach a mutually agreeable settlement and is not intended as our agreement with Prenalta's position that the base price specified in the contract is not the applicable price for your deregulated gas.

(P.Exh. 10). To which Prenalta responded in their September 10, 1986 letter: "We are, of course, pleased that CIG has made this increase in price as a good faith expression of their willingness to reach a mutually agreeable settlement, and we reiterate our desire to resolve the many issues facing us in a fair and expeditious manner." (Exh. 6 to P.Exh. 1). Although CIG continued to pay a commercially reasonable price for deregulated gas under Contract 422 and 516, CIG persisted in its position that the escalated base price was the applicable contract price in its subsequent correspondence with Prenalta.

As late as December 18, 1987, however, CIG sent a letter to Prenalta concerning Contract 422 stating that "[p]ending determination of a price for deregulated gas, the law requires CIG to pay a commercially reasonable price." (Exh. 8 to P.Exh. 1). CIG then offered $1.30/MMBtu as a commercially reasonable price, although reiterating that "CIG retains its position that upon deregulation the price under the contract reverts to the contract base price of Article V. The commercially reasonable price has been offered in light of ongoing negotiations and a spirit of cooperation between the parties."

A similar letter was sent to Prenalta by CIG on January 5, 1988 concerning Contract 516 but instead of reasserting CIG's position that the applicable price was the escalated base price, the letter simply stated:

> [I]n the event of a redetermination of this price, pursuant to Article V of the referenced contract, CIG hereby notifies

you that the alternate price to apply to all deregulated gas is $1.30 per MMBtu. If you disagree, or if you wish to negotiate changes in the contract to provide for a different price, we would be happy to discuss the matter with you.

(Exh. 9 to P.Exh. 1).

Failing to renegotiate the terms of the contracts, CIG sent a final letter to Prenalta on December 22, 1988 addressing the "two main issues, pricing and take-or-pay." (Exh. 10 to P.Exh. 1). After taking exception to Prenalta's estimates of CIG's "take" deficiencies, CIG claimed $713,-000.00 in overpayments to Prenalta since January 1, 1985 because the "price payable for deregulated gas produced under Contract 422 (dated August 12, 1971) and Contract 516 (dated June 1, 1973) was the base price as provided in Paragraph 5.1(a)," and CIG had only complied with Prenalta's demand "in a conciliatory gesture to continue negotiations."

Unable to reach any negotiated modification of Contracts 422 and 516, Prenalta brought suit against CIG in March 1989. On cross-motions for partial summary judgment, CIG argued that the applicable price under Contracts 422 and 516 was the escalated base price of § 5.1(a) and (b), while Prenalta argued that a commercially reasonable price was the contract price in the absence of redetermination. The district court agreed with CIG and found that the pricing provisions in § 5.1(a–d) in Contracts 422 and 516 were clear and unambiguous: if Prenalta failed to exercise its right to price redetermination within six months after deregulation pursuant to § 5.1(d), then the price scale set forth in § 5.1(a), escalated at a rate in accordance with § 5.1(b), determines the price to be paid under the contracts.

CIG then moved for summary judgment on its counterclaim for a refund of the difference between the amount paid Prenalta since January 1, 1985 and the escalated contract base price. The district court granted CIG's motion and held that CIG was entitled to a refund of the money paid in excess of the escalated base price, in the amount of $124,826 under Contract 422 and $1,023,844 under Contract 516.[10] In so holding the district court reasoned that CIG's reservation of rights under Wyo. Stat. § 34.1–1–207(a) (1991)[11] entitled CIG to a refund as a matter of law and Prenalta had failed to establish any issue of material fact in support of its arguments that CIG had waived its right to a repayment or was equitably estopped from seeking repayment.

We review *de novo* the district court's grant of summary judgment. *Manders v. Oklahoma*, 875 F.2d 263, 264–65 (10th Cir. 1989); *Kaiser–Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). Summary judgment pursuant to Fed.R.Civ.P. 56 is appropriate where "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." If there is sufficient evidence on which a trier of fact could reasonably find for the nonmoving party, then summary judgment cannot be granted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Windon Third Oil and Gas Drilling Partnership v. FDIC*, 805 F.2d 342, 345–46 (10th Cir. 1986).

Prenalta argues that there is sufficient evidence to raise a factual question regarding CIG's waiver of any right to a refund

---

**10.** The actual judgment entered on December 12, 1989 totaled $1,100,032.99, based on the corrected affidavit of C. Dennis Ellison, the Director of Accounting for CIG.

**11.** We refer to the renumbered sections of title 34.1 of the Wyoming statutes, the Uniform Commercial Code. In 1989 former articles 1 through 10 (§§ 34–21–101 through 34–21–1002) of chapter 21 of title 34 were renumbered as the present title 34.1 (§§ 34.1–1–101 through 34.1–

10–104), in accordance with Wyo.Stat. § 28–8–105.

The Official Comments to the Uniform Commercial Code were added to the corresponding sections in 1991. Only § 34.1–1–207 has been substantively amended, effective July 1, 1991, by the addition of subsection (b) which reads: "Subsection (a) does not apply to an accord and satisfaction."

by knowingly making payments in the spirit of compromise based on prices in excess of that contractually required. Prenalta, in fact, contends that the evidence is so compelling that CIG waived its right to a refund as a matter of law under the "voluntary payments" doctrine. Prenalta, however, did not urge such by way of summary judgment below.

"Waiver is the intentional relinquishment of a known right manifested in an unequivocal manner." *St. Paul Fire & Marine Ins. Co. v. Albany County School Dist. No. 1*, 763 P.2d 1255, 1262 (Wyo. 1988). "[T]he necessary intent for waiver may be implied from conduct," but the "conduct should speak the intent clearly." *Murphy v. Stevens*, 645 P.2d 82, 93 (Wyo. 1982). The correspondence and course of dealings between Prenalta and CIG from 1984 through 1989 clearly indicate that the parties were engaged in the process of renegotiating the terms of Contracts 422 and 516. Both parties apparently recognized the "drastic changes" which had occurred in CIG's gas market and were attempting to reach a settlement which would result in Prenalta's forgiveness of CIG's alleged take-or-pay liability and in reduction of CIG's take obligations, while assuring Prenalta a commercially reasonable price for its gas. To accomplish this end, Prenalta elected not to exercise its right to redetermination of the price under Contracts 422 and 516, and CIG agreed to pay Prenalta the difference between the commercially reasonable price and the escalated base price from January 1, 1985 through August 1986 for Contract 516 gas in a retroactive adjustment made on August 20, 1986 and to continue paying a commercially reasonable price for gas under both Contracts 422 and 516. We find that CIG's conduct in making retroactive and continuous payments of a commercially reasonable price from 1985–1989 presents a factual question of whether CIG intentionally relinquished its claim to a refund of the amount paid in excess of the escalated base price in its effort to keep Prenalta at the negotiating table.

Wyoming law recognizes the common law doctrine of voluntary payments. In *Fulton v. Des Jardins*, 67 Wyo. 517, 227 P.2d 240, 245 (1951), the Supreme Court of Wyoming adopted the " 'universally recognized rule that money voluntarily paid under a claim of right to the payment, and with knowledge of the facts by the person making the payment, cannot be recovered back on the ground that ... there was no liability to pay in the first instance.' " *See also Thurmon v. Clark*, 507 P.2d 142, 143 (Wyo.1973).

The record before us invites an analysis of the application of the voluntary payments doctrine. CIG argued and the district court agreed that Contracts 422 and 516 clearly and unambiguously state that the escalated base price under § 5.1(a) and (b) is the contract price in the absence of redetermination under § 5.1(d). Prenalta elected not to exercise its right to redetermination of the price. CIG, therefore, was only obligated to pay the escalated base price since January 1, 1985. We find that there is sufficient evidence in the record to persuade a reasonable trier of fact that, upon Prenalta's "claim of right," CIG voluntarily paid a commercially reasonable price for gas under Contracts 422 and 516.

CIG counters that its conduct does not unequivocally manifest its intent to relinquish a claim for repayment because pursuant to Wyo.Stat. § 34.1–1–207(a) (1991) it reserved its right to seek repayment. Section 34.1–1–207(a) states that "[a] party who, with explicit reservation of rights, performs or promises performance or assents to performance in a manner demanded or offered by the other party does not thereby prejudice the rights reserved. Such words as 'without prejudice', 'under protest' or the like are sufficient." CIG argues that if it "intended to make voluntary payments and abandon the base price issue, there would have been no reason to state in the September 5, 1986 letter and subsequent correspondence that CIG was not waiving its rights."

CIG, however, confuses the "right" reserved. In these letters, CIG reserved its

legal right to limit its payments to the contract price, the escalated base price under 5.1(a) and (b); CIG did not reserve its "right" to a refund of money it decided to pay to continue negotiations with Prenalta. In CIG's September 5, 1986 letter which followed its August 8, 1986 retroactive payment, CIG emphasized that the increase in price was implemented "as a good faith expression of our willingness to reach a mutually agreeable settlement and is not intended as our agreement with Prenalta's position that the base price specified in the contract is not the applicable price for your deregulated gas." That the increase payment was made to foster negotiation was obviously understood by Prenalta when Prenalta responded in its September 10, 1986 letter to CIG that it was "of course, pleased that CIG has made this increase in price as a good faith expression of their willingness to reach a mutually agreeable settlement." The excess payments made by CIG were, therefore, extra-contractual and voluntary, and any right to their repayment would have had to arise from an agreement between the parties. No such agreement exists in the record on appeal. Prenalta's demand for the increase in price before it would continue negotiating with CIG as set forth in its letters of February 12, 1986 and June 11, 1986 certainly does not evidence Prenalta's agreement to refund the excess payments if negotiations failed. The record reflects the only "right" CIG reserved was its position that the escalated base price was the applicable price under the terms of Contract 516.[12]

We, therefore, conclude that there is substantial evidence of CIG's waiver of any right to a refund of money voluntarily paid in excess of that required under Contracts 422 and 516 to preclude summary judgment in favor of CIG.

█ Prenalta also asserts an estoppel defense to CIG's counterclaim. To prove that CIG is estopped from a refund of the ex-

cess payments, Prenalta must show that it (1) lacked knowledge of the facts and was unable to discover them, and (2) detrimentally relied on CIG's conduct or representations. *Roth v. First Security Bank*, 684 P.2d 93, 96 (Wyo.1986). The above evidence in support of Prenalta's defense of waiver also reveals material issues of fact as to whether CIG is equitably estopped from obtaining a refund of excess payments, which must be resolved by the trier of fact.

## II.

Prenalta also appeals the district court's summary judgment ruling that Prenalta is precluded from recovering damages for CIG's alleged breach of its take-and-pay obligations under the 300 Series Contracts and its take-or-pay obligations under Contracts 422 and 516 because Prenalta failed to plead the proper measure of damages under Wyo.Stat. § 34.1–2–708(b) (1991). In so ruling, the district court reasoned that 1) the Wyoming Uniform Commercial Code (UCC) applies to the subject contracts and provides the remedy for their breach; 2) Prenalta seeks damages in the amount of the full contract price; 3) the seller's remedy under the UCC which allows recovery of the full contract price, Wyo.Stat. § 34.1–2–709 (1991), is inapplicable to the facts of this case because the goods (the natural gas) are not "identified to the contract"; 4) Prenalta's remedy for breach of the subject contracts lies in § 34.1–2–708(b) which provides for lost profits; and 5) Prenalta has failed to plead a measure of damages under which it would be entitled to any recovery. Therefore, although it was uncontroverted that CIG had breached its take-and-pay and take-or-pay obligations under the subject contracts, the trial court granted summary judgment to CIG. Prenalta argues that it correctly stated the measure of damages for breach of the subject con-

---

**12.** Judge Holloway is unable to join in the preceding paragraph of this opinion, commencing with the words "CIG, however, confuses the 'right' reserved" and concluding with the words "... under the terms of Contract 516." He is of the opinion that this portion of the opinion is unnecessary to proper disposition of the instant appeal, and that such paragraph expresses views on ultimate fact questions for trial, and related issues which should be left for determination on remand.

tracts as the value of CIG's "shortfall";[13] and even if such measure is incorrect, it should be permitted the opportunity to offer evidence on the "lost profits" measure of damages which resulted from CIG's breach.

### A.

Contracts 422 and 516 are take-or-pay contracts. Prenalta alleges that under Article IV of the contracts, CIG agrees to "take" during each contract year a minimum of 1000 Mcf of gas per day for each 7.3 million Mcf of committed reserves attributable to the contract wells—the "contract quantity" under § 4.1(a) of the contracts. If CIG fails to purchase the contract quantity for any year, then the contract provides that CIG would have to "pay" for the contract quantity:

> 4.2 FAILURE OF BUYER TO TAKE CONTRACT QUANTITY—If during any 1–year period, commencing with the 1st day of the month in which initial delivery is made from each well, Buyer shall fail to take the Contract Quantity of gas from such well, then Buyer shall pay Seller on or before the 20th day of the 2nd month of the next following year for that quantity of gas which is equal to the difference between the Contract Quantity and Buyer's actual takes during such period. . . . During the 5 years next succeeding a year in which Buyer has failed to take the gas so paid for, all gas taken by Buyer from Seller which is in excess of the Contract Quantity of gas for the current year . . . shall be known as

Make-up Gas and shall be delivered without charge to Buyer until such excess equals the amount of gas previously paid for but not taken, provided that Buyer shall not be permitted to make up any canceled allowable.

Upon payment of the "difference between the Contract Quantity and Buyer's actual takes" (the "shortfall"), CIG is credited the gas paid for but not taken. CIG can recoup this "Make-up Gas" over the succeeding five years.

■ Prenalta argues that § 4.2 of Contracts 422 and 516 clearly provides the contract remedy for breach, and that the measure of damages under the provision is the value of the "quantity of gas which is equal to the difference between the Contract Quantity and Buyer's actual takes" for each year CIG has been in breach of the contracts.[14] We agree.

■ Gas purchase contracts are contracts for the sale of goods and are governed by Article 2 of the Uniform Commercial Code (UCC). Wyo.Stat. §§ 34.1–2–105(a), 34.1–2–107(a) (1991);[15] *American Exploration Co. v. Columbia Gas Transmission Corp.*, 779 F.2d 310, 314 (6th Cir. 1985); *Northwest Cent. Pipeline Corp. v. Mesa Petroleum Co.*, 723 F.Supp. 1410, 1413 (D.Colo.1989). Although the UCC applies to gas purchase contracts, the parties can vary the provisions of the UCC by agreement, pursuant to Wyo.Stat. § 34.1–1–102(c) (1991):

> The effect of provisions of this act may be varied by agreement, except as other-

---

**13.** The "shortfall" is the quantity of gas which is equal to the difference between the contract quantity and buyer's actual takes.

**14.** Prenalta does not claim repudiation of the contracts, but seeks damages for the years CIG failed to purchase the contract quantity or to make take-or-pay payments under § 4.2 of Contracts 422 and 516. Although Prenalta alleges that CIG has failed to make take-or-pay payments since 1983, it acknowledges that its pre–1985 claims are barred by the four-year statute of limitation, Wyo.Stat. § 34.1–2–725(a) (1991).

**15.** "Goods" means all things (including specially manufactured goods) which are movable at the time of identification to the contract for

sale other than the money in which the price is to be paid, investment securities (article 8) and things in action. "Goods" also includes the unborn young of animals and growing crops and other identified things attached to realty as described in the section of goods to be severed from realty (section 34.1–2–107).

Wyo.Stat. § 34.1–2–105(a) (1991).

> A contract for the sale of timber, minerals or the like or a structure or its materials to be removed from realty is a contract for the sale of goods within this article if they are to be severed by the seller but until severance a purported present sale thereof which is not effective as a transfer of an interest in land is effective only as a contract to sell.

Wyo.Stat. § 34.1–2–107(a) (1991).

wise provided in this act and except that the obligations of good faith, diligence, reasonableness and care prescribed by this act may not be disclaimed by agreement but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable.

Furthermore, Wyo.Stat. § 34.1–2–719(a)(i) (1991) of the UCC specifically states that the parties by agreement "may provide for remedies in addition to or in substitution for those provided in this article and may limit or alter the measure of damages recoverable under this article." We find that the language of § 4.2 of Contracts 422 and 516 unambiguously expresses the intent of Prenalta and CIG to fashion a specific remedy for breach by requiring CIG to pay the value of the shortfall—the contract price multiplied by the difference between the contract quantity and the amount of gas actually taken during each one year period.

The purpose of contract interpretation is to determine the intention and understanding of the parties. *Amoco Prod. Co. v. Stauffer Chem. Co.*, 612 P.2d 463, 465 (Wyo.1980). The interpretation of the contract is conducted by the court as a matter of law. *Id.* "Unless the terms of the contract are ambiguous, the language used in the contract expresses and controls the intent of the parties." *State v. Pennzoil Co.*, 752 P.2d 975, 978 (Wyo.1988); *Amoco Prod.*, 612 P.2d at 465. "The terms of the take-or-pay clause are unambiguous, common to the gas industry, and fully enforceable." *Universal Resources Corp. v. Panhandle E. Pipe Line Co.*, 813 F.2d 77, 80 (5th Cir.1987). A contract, however, does not exist in a vacuum; its terms must be understood in light of the commercial context within which it was drawn. *Pennzoil Co.*, 752 P.2d at 978; Wyo.Stat. §§ 34.1–1–205, 34.1–2–202 (1991). To determine the intent of the parties, the court must look to the instrument itself, its purposes and the surrounding circumstances

of its execution and performance. *Pennzoil Co.*, 752 P.2d at 978.

At the time Contracts 422 and 516 were executed, take-or-pay provisions in gas purchase contracts were common in the natural gas industry. In return for the producer's exclusive dedication of the gas from its wells to the pipeline over a long term, take-or-pay clauses were drafted to assure the producer a continuous cash flow and to shift the risk of market demand to the pipeline:

> The purpose of the take-or-pay clause is to apportion the risks of natural gas production and sales between the buyer and seller. The seller bears the risk of production. To compensate seller for that risk, buyer agrees to take, or pay for if not taken, a minimum quantity of gas. The buyer bears the risk of market demand. The take-or-pay clause insures that if the demand for gas goes down, seller will still receive the price for the Contract Quantity delivered each year.

*Universal Resources*, 813 F.2d at 80. It is accepted practice in the natural gas industry that "[i]n the event of failure of Buyer to take the quantity of gas specified in a 'take-or-pay' contract, Buyer is required to pay for the specified quantity of gas." 4 H. Williams, *Oil and Gas Law* § 724.5, at 665 (1990). The express language of § 4.2 and the industry-recognized purpose of take-or-pay clauses compel the interpretation of the provision as Prenalta's remedy for CIG's failure to take the contract quantity of gas under Contracts 422 and 516. Any other interpretation would defeat the purpose of the take-or-pay clause: to insure Prenalta annual payments for the contract quantity in return for Prenalta's dedication of its gas and CIG's right to make-up any "take" deficiencies over a five-year period.

CIG argues that § 4.2 of the contracts provides for alternative performance under the contracts and as such cannot be a remedy for breach of performance. CIG further contends that if § 4.2 is interpreted as a remedy, it is necessarily an unenforceable liquidated damages or penalty provision.

We have previously recognized in *International Minerals and Chem. Corp. v. Llano, Inc.*, 770 F.2d 879, 885 (10th Cir. 1985), *cert. denied*, 475 U.S. 1015, 106 S.Ct. 1196, 89 L.Ed.2d 310 (1986), that a take-or-pay contract provides for performance in the alternative: "Since this is a 'take or pay' contract, the buyer can perform in either of two ways. It can either (1) take the minimum purchase obligation of natural gas (and pay) or (2) pay the minimum bill." *Id.* *See also PGC Pipeline v. Louisiana Intrastate Gas*, 791 F.2d 338, 340 (5th Cir.1986); *Resources Investment Corp. v. Enron Corp.*, 669 F.Supp. 1038, 1041 (D.Colo.1987); *Superior Oil Co. v. Transco Energy Co.*, 616 F.Supp. 98, 107 (W.D.La.1985); *Hanover Petroleum Corp. v. Tenneco, Inc.*, 521 So.2d 1234, 1241 (La. Ct.App.1988), *writ denied*, 526 So.2d 800 (La.1988); *Pogo Producing Co. v. Sea Robin Pipeline Co.*, 493 So.2d 909, 915–16 (La. Ct.App.1986), *writ denied*, 497 So.2d 310 (La.1986). Because one of the alternative performances in a take-or-pay contract is the payment of money, courts have distinguished the "pay" provision from a liquidated damages provision. *Universal Resources*, 813 F.2d at 80 n. 4; *Sabine Corp. v. ONG Western, Inc.*, 725 F.Supp. 1157, 1184 (W.D.Okla.1989); *Enron*, 669 F.Supp. at 1041. This distinction is particularly necessary because the payments made pursuant to the take-or-pay provision, the "pay" alternative of Contracts 422 and 516, are not payments for the sale of gas. *Kaiser–Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 570 (10th Cir.1989) (quoting *ANR Pipeline Co. v. Wagner & Brown*, 44 FERC ¶ 61,057, 61,158 (1988) ("[T]he take-or-pay payment for gas is not intended to be a payment for gas and is not a part of the price of gas until it is applied at the time of sale.")); *Diamond Shamrock Exploration Co. v. Hodel*, 853 F.2d 1159, 1167–68 (5th Cir.1988). The difference between alternative performance and liquidation of damages is lucidly explained in § 1082 of *Corbin on Contracts:*

It is evident that some alternative contracts giving the power of choice between the alternatives to the promisor can easily be confused with contracts that provide for the payment of liquidated damages in case of breach, provided that one of the alternatives is the payment of a sum of money.... If, upon a proper interpretation of the contract, it is found that the parties have agreed that either one of the two alternative performances is to be given by the promisor and received by the promisee as the agreed exchange and equivalent for the return performance rendered by the promisee, the contract is a true alternative contract. This is true even though one of the alternative performances is the payment of a liquidated sum of money; that fact does not make the contract one for the rendering of a single performance with a provision for liquidated damages in case of breach.[16]

Under the terms of Contracts 422 and 516, CIG could elect either to purchase the contract quantity or to pay the value of the contract quantity (the "minimum bill") in exchange for Prenalta's tender of the contract quantity of gas or any make-up gas due CIG for past deficiencies. This is clearly an alternative contract which allows CIG to perform either alternative, to "take" or "pay" for the gas, in exchange for Prenalta's return performance, rather than a contract which requires CIG to "take" the contract quantity of gas with a triggering liquidated damages provision if CIG fails to do so.

Section 4.2 also sets the parameters of the alternative performances under the Contracts 422 and 516. CIG can elect to purchase the contract quantity of gas only within "any 1–year period, commencing with the 1st day of the month in which initial delivery is made from each well." If CIG does not purchase the contract quantity of gas within the 1–year period, CIG "*shall* pay Seller on or before the 20th day of the 2nd month of the next following

---

**16.** 5 A. Corbin, *Corbin on Contracts* § 1082, at   463–64 (1964).

year for that quantity of gas which is equal to the difference between the Contract Quantity and Buyer's actual takes during such period." (emphasis added). This type of alternative contract eliminates the availability of one alternative with the passage of time. *See Ply–Gem Indus., Inc. v. Green,* 503 F.2d 1362, 1366 (2nd Cir.1974). As stated in § 1085 of *Corbin on Contracts:*

> An alternative contract may be so drawn as to limit the power of the promisor to discharge his contractual duty by performing one of the alternatives to a definite period of time, after the expiration of which only the other alternative is available to him. After the expiration of the specified period, the obligation of the promisor becomes single and the contract is no longer alternative. In cases like this, *the promisee must always estimate his damages on the basis of the second alternative....* Usually the alternative that is eliminated by the expiration of the period of time is the performance of service or the transfer of property, while the second alternative is the payment of a named sum of money.[17]

Section 4.2 limits CIG's "take" alternative to a period of one year, after which CIG's obligation is sole: the payment of the minimum bill. Prenalta's damages are therefore measured by CIG's obligation to pay— the value of which is the contract price in effect at the time such deficiency occurred[18] multiplied by the difference between the contract quantity and the actual quantity of gas purchased for any year CIG was in breach of Contract 422 and/or Contract 516.

### B.

The 300 Series Contracts are take-and-pay contracts. Under § 4.1 of the 300 Series Contracts, CIG is required to take and pay for one thousand Mcf of gas per day for each eight million Mcf committed reserves attributable to a contract well during a delivery period (initially a five-year period, then subsequent three-year periods). Failure to do so results in breach of the contracts. Unlike the take-or-pay Contracts 422 and 516, the take-and-pay 300 Series contracts do not contain a remedy provision:

> To be distinguished from a "take-or-pay" obligation is one which has been described as a "take-*and*-pay" obligation, *viz.,* an agreement to buy a specified quantity of gas and to pay for same. In the event of failure of Buyer to take the quantity of gas specified in a "take-or-pay" contract, Buyer is required to pay for the specified quantity of gas. In the event of failure of Buyer to take the quantity of gas specified in a "take-and-pay" contract, the contract measure of damages is applicable....

4 H. Williams, *Oil and Gas Law* § 724.5, at 665 (1990).

As stated above, gas purchase contracts are contracts for the sale of goods under title 34.1 of the Wyoming statutes (UCC), §§ 34.1–2–105(a), 34.1–2–107(a) (1991). In the absence of a contracted remedy, Prenalta's remedy for CIG's breach of the take-and-pay 300 Series Contracts is provided by the available seller's remedy or remedies under Wyo.Stat. § 34.1–2–703 (1991).

The trial court's analysis concerning the measure of damages for breach of the 300 Series Contracts is correct. Section 34.1–1–106(a) of the Wyoming UCC states that "[t]he remedies provided by this act shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed." While an action for the price pursuant to § 34.1–2–709(a)(ii) would effectively compensate Prenalta for CIG's breach, it is inapplicable here, as the gas has not been produced and, therefore, is not identified to the contract. *Piney*

---

**17.** *Id.* § 1085, at 469–71 (emphasis added).

**18.** The price for deregulated gas under Contracts 422 and 516, from January 1, 1985 until it is redetermined pursuant to § 5.1(d), is the escalated contract base price as set forth in § 5.1(a) and (b) of the contracts.

*Woods Country Life School v. Shell Oil Co.,* 726 F.2d 225, 234 (5th Cir.1984), *cert. denied,* 471 U.S. 1005, 105 S.Ct. 1868, 85 L.Ed.2d 161 (1985). The parties agree that § 34.1–2–708(a), contrarily, would not put Prenalta in as good a position as if CIG had performed because the price under the contracts is less than the market price at the time and place of tender. Prenalta's remedy, therefore, is provided by § 34.1–2–708(b) [19]:

> If the measure of damages provided in subsection (a) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this article (section 34.1–2–710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

In ¶ 64 of its complaint, Prenalta alleges that it has been "damaged by CIG's breach of Contract Nos. 321, 323, 324 and 327 in an amount to be determined at trial." We agree with Prenalta that it should be allowed an opportunity to offer evidence of any lost profits which resulted from CIG's breach of Contracts 321, 323, 324 and 327.

### III.

In conclusion, we VACATE the district court's summary judgment granting CIG's counterclaim in the amount of $1,100,-032.99, and REMAND for jury trial on the merits, which includes Prenalta's defenses of waiver and estoppel. Further, the district court's summary judgment in favor of CIG on Prenalta's claim for damages for breach of the take-or-pay Contracts 422 and 516 and the take-or-pay 300 Series Contracts is REVERSED and REMANDED for jury trial consistent with the above analysis.

BRETT, District Judge, writing separately,

On remand and before the record is closed, if additional evidence is not received creating a genuine issue of fact regarding voluntary payments, I am of the view that the present record requires directing a verdict in favor of Prenalta on CIG's counterclaim for a refund.

---

**19.** It is not clear from the record whether free market competition exists for Prenalta's natural gas or whether the production is limited by pipeline accessibility and control.