KAISER–FRANCIS OIL COMPANY, a Delaware corporation, Plaintiff-Appellee,

v.

PRODUCER'S GAS COMPANY, a Texas Corporation, Defendant–Appellant.

No. 86–2382.

United States Court of Appeals, Tenth Circuit.

March 8, 1989.

J. Michael Medina (Bruce M. Daniel with him on the brief and Holliman, Langholz, Runnels & Dorwart, of counsel), Tulsa, Okl., for plaintiff-appellee.

Richard E. Miller of Robertson & Miller, Dallas, Tex. (Craig W. Hoster of Baker, Hoster, McSpadden, Clark, Rasure & Slicker, Tulsa, Okl., with him on the brief), for defendant-appellant.

Before ANDERSON, BALDOCK and EBEL, Circuit Judges.

BALDOCK, Circuit Judge.

Appellee and seller, Kaiser–Francis Oil Co. (Kaiser–Francis), sought to enforce the provisions of two similar gas purchase contracts (the "Ellis" and "Cronin" contracts) against appellant and buyer, Producer's Gas Co. (PGC). Under the contracts, PGC was required to take or pay for certain minimum quantities of gas from wells in which Kaiser–Francis had a percentage interest. When the resale price for natural gas declined, PGC did not pay Kaiser–Francis for gas taken on the theory that it was purchasing the gas from Kaiser–Francis' co-owners at reduced prices. PGC also declined to pay for the minimum contract

quantities of the gas which were not taken. PGC's actions were based on various defenses to the contracts. The district court granted summary judgment on the issue of liability in favor of Kaiser–Francis, thereby rejecting all of PGC's defenses. The parties thereafter stipulated as to the appropriate damages, interest and attorney's fees that would accrue upon the liability determination. Thus, we consider only issues of liability under the contracts, whether the district court improperly rejected any or all of PGC's defenses to the contract.

On appeal, PGC contends that the district court erred in granting partial summary judgment in favor of Kaiser–Francis because 1) the force majeure provision in the contracts extends to a partial lack of demand caused by market forces, 2) the gas to be supplied by Kaiser–Francis failed to meet the quality specifications of the contract, 3) PGC was not purchasing gas from Kaiser–Francis, but rather from Kaiser–Francis' co-owners in various wells, and 4) any take-or-pay payments required under the contract would violate ceiling prices set by the Natural Gas Policy Act [NGPA]. We find each of these contentions without merit and affirm. Our jurisdiction to review this diversity case arises under 28 U.S.C. § 1291. Consistent with the choice of law provision in each contract, we apply Oklahoma substantive law.

Summary judgment is appropriate when the materials submitted to the court "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). What facts are materi-

al depends on the substantive law being applied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Although we view the evidence in the light most favorable to the party opposing summary judgment, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), disputes about immaterial facts will not preclude summary judgment. *Anderson*, 477 U.S. at 247–48, 106 S.Ct. at 2509–10. Should a non-moving party make some showing on a material issue, we must consider the standard of proof in the case (here, a preponderance of evidence) and decide whether the showing is sufficient for a reasonable trier of fact to find for the non-moving party on that issue. *Id.* at 253, 106 S.Ct. at 2512–13. A scintilla of evidence in favor of the non-moving party is not enough to preclude summary judgment. *Id.* Moreover, should a non-moving party not make a sufficient showing on any essential element of his case, all other facts are rendered immaterial, and summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Based on our *de novo* review of the grant of partial summary judgment, we are convinced "that the issues before us may be resolved as a matter of law." *Missouri Pac. R.R. Co. v. Kansas Gas & Elec. Co.*, 862 F.2d 796, 799 (10th Cir.1988). Accordingly, summary judgment was proper.

## I.

■ PGC first contends that the force majeure provision[1] in each contract ex-

---

**1.** *14.1* Except for Buyer's obligations to make payment due for gas delivered hereunder, neither party shall be liable for failure to perform this agreement when such failure is due to "force majeure." "Force majeure" shall mean acts of God, strikes, lockouts, or industrial disputes or disturbances, civil disturbances, arrests and restraints, interruptions by government or court orders, present and future valid order of any regulatory body having proper jurisdiction, acts of the public enemy, wars, riots, insurrections, inability to secure labor or inability to secure materials, including inability to secure materials by reason of allocations promulgated by authorized governmental agencies, epidemics, fires, ex-

plosions, breakage or accident to machinery or lines of pipe, freezing of wells or pipelines, inability to obtain easements, right-of-way or other interests in realty, the making of repairs, replacements or alterations to lines of pipe or plants, **partial or entire failure of gas supply or demand over which neither Seller nor Buyer have [sic] control** or any other cause, whether of the kind herein enumerated or otherwise, not reasonably within the control of the party claiming "force majeure." Events of "force majeure" shall, so far as possible, be remedied with all reasonable dispatch. The settlement of industrial difficulties shall be within the discretion of the party

tends to a lack of demand for gas, thereby providing relief in this case from the take-or-pay obligation[2] contained in each contract. PGC suggests that there is an issue of fact concerning the extent of the failure of demand for gas. Essentially, PGC contends that a force majeure event occurred because the demand for gas sharply decreased, with a corresponding decrease in the resale price of gas that PGC was obligated to take or pay for under the contracts. Unfortunately for PGC, however, the Oklahoma Supreme Court, in interpreting a similar force majeure provision, has determined that neither a decline in demand, nor an inability to sell gas at or above the contract price, constitutes a force majeure event. *Golsen v. Ong Western, Inc.*, 756 P.2d 1209, 1213 (Okla.1988) (interpreting force majeure provision extending to "failure of gas supply or markets"). That decision applies to this case.

PGC's interpretation of the force majeure provision is antithetical to the take-or-pay provision. Under its interpretation, PGC could be expected to take only when the demand for gas resulted in a resale price at or above the contract price. PGC could never be expected to take or pay when the demand for gas resulted in a resale price below the contract price. Rather than taking or paying under the take-or-pay provision, PGC would rely on the force majeure provision. Thus, Kaiser–Francis would be shut in during any drop in demand, for up to twenty years, without any ability to sell in other markets. Such a one-sided interpretation is suspect.

The purpose of the take-or-pay clause is to apportion the risks of natural gas production and sales between the buyer and seller. The seller bears the risk of production. To compensate the seller for that risk, the buyer agrees to take, or pay for if not taken, a minimum quantity of gas. The buyer bears the risk of market demand.

*Universal Resources Corp. v. Panhandle E. Pipe Line Co.*, 813 F.2d 77, 80 (5th Cir.1987); *see also Golsen*, 756 P.2d at 1213; 4 H. Williams & C. Meyers, *Oil & Gas Law* § 724.5 (1988) (take-or-pay provision assures the seller "of a minimum annual return and that his premises will be permitted to produce in paying quantities"). Should the resale price decline below the contract price, PGC could still take the gas and sell it, albeit at a loss, or pay for the gas without taking it, also at a loss. The change in the general or relative resale price of gas does not constitute a "partial failure of gas demand" which would relieve PGC of its obligation to take or pay. The force majeure provision cannot substitute for a price redetermination or market-out provision which would allow PGC to reduce the price paid to Kaiser–Francis for gas, thereby ameliorating PGC's take-or-pay obligation when the resale price of natural gas declined.

## II.

PGC next contends that it was excused from its take-or-pay obligation because the gas did not meet the quality specification provision concerning allowable water vapor in the gas.[3] Like gas not taken by reason

having the difficulty, and the requirement that "force majeure" be remedied with all reasonable dispatch shall not require the settlement of industrial difficulties by acceding to the demands of any opposing party when such course is inadvisable in the discretion of the party having the difficulty.
Rec. vol. II (Attachment to Brief In Support of Kaiser–Francis Oil Company's Motion for Partial Summary Judgment—1980 Ellis & 1982 Cronin contracts) (emphasis added).

2. *4.1* Subject to all terms and conditions of this Agreement, Seller shall sell and deliver during each Accounting Year from the lands and leases covered hereby, and Buyer shall purchase and receive from Seller or pay for if available but not taken, a quantity of gas equal to the Daily Contract Quantities herein specified.
*4.7* If at the end of any Accounting Year, Buyer shall have failed to purchase during such Year the sum the applicable Daily Contract Quantities, after credit is allowed for (i) deficiency existing by *force majeure, ...*, Buyer shall pay for the remaining deficiency as if taken.
Rec. vol. II (Attachment to Brief in Support of Kaiser–Francis Oil Company's Motion for Partial Summary Judgment—1980 Ellis and 1982 Cronin contracts).

3. *9.1* The gas delivered at the delivery point shall be commercially free of gum, gum-forming constituents, gasoline, and other solid or liquid matter that may become separated

of force majeure, ¶ 4.7 of the contracts allows PGC a credit against its take-or-pay obligation for "quantities of gas not taken for failure of the gas to meet the quality specifications" contained in each contract. *See* rec. vol. II, contracts at ¶ 4.7 (Attachment to Brief in Support of Kaiser–Francis Oil Company's Motion for Partial Summary Judgment—1980 Ellis & 1982 Cronin Contracts). PGC established a factual issue concerning whether the gas met the quality specification, *see* rec. vol. I, doc. 40 (Thompson affidavit), however, Kaiser–Francis conceded the point for purposes of summary judgment.[4] Still, the district court granted summary judgment on this issue in favor of Kaiser–Francis because of the lack of adequate assurances by PGC that PGC would perform under the contract, even if remedial measures were undertaken by Kaiser–Francis to cure the water vapor problem.

The contract allowed Kaiser–Francis the right to cure.[5] The district court decision on this issue follows from certain uncontroverted facts. When Kaiser–Francis notified PGC of its 1982 take-or-pay liability under the Ellis contract, PGC denied liability on the basis of the force majeure and quality specification provisions discussed above. PGC then proposed a contract amendment which would have modified the take-or-pay arrangement with a system of "flexible pricing of natural gas at the well-

head to respond to constantly changing market conditions." Rec. vol. II (Attachment to Brief in Support of Kaiser–Francis Oil Company's Motion for Partial Summary Judgment—Letter from PGC to Kaiser dated March 30, 1983, at 2). The amendment[6] would have given PGC, among other things, unilateral control over price. PGC sent its letter and contract amendment to every producer with which it had a gas purchase contract in Oklahoma. *Id.* PGC made it clear that it intended "to take ratably on each system from all producers agreeing to this contract amendment" and that it would only take under the terms and conditions it proposed. *Id.* at 2, 4.

Kaiser–Francis rejected the amendment and demanded that PGC pay for that proportion of gas already taken and attributable to Kaiser–Francis. Rec. vol. II (Attachment to Brief in Support of Kaiser–Francis Oil Company's Motion for Partial Summary Judgment–Letter from Kaiser–Francis to PGC dated June 15, 1988). Kaiser–Francis also sought assurance that PGC intended to perform its take-or-pay obligation. *Id.;* Okla.Stat.Ann. tit. 12A, § 2–609(1) (West 1981) (right to assurance of performance under U.C.C.). PGC responded by reiterating that the failure of market demand was a force majeure condition and that it intended to fulfill the obligations of the contract. PGC, however, made it abundantly

---

from the gas during transportation thereof and shall conform to the following specifications:

.   .   .   .   .

(i) water vapor   Not more than seven (7) pounds per million cubic feet

.   .   .   .   .

Rec. vol. II (Attachment to Brief in Support of Kaiser–Francis Oil Company's Motion for Partial Summary Judgment—1980 Ellis and 1982 Cronin contracts).

4. Kaiser–Francis submitted uncontroverted evidence, however, that PGC continued to purchase gas from other working interest owners of the same wells, even though these working interest owners took no action to reduce the water content of the gas.

5. *9.2* Buyer, at its option, may refuse to accept delivery of any gas not meeting the quality specifications set out in this Article IX; there-

after Seller shall have the right to conform gas to the above specifications.

.   .   .   .   .

Rec. vol. I., doc. 1 (Attachment to complaint—1980 Ellis contract).

6. Commencing on May 1, 1983 and for the remainder of the term of the Agreement, Buyer shall pay Seller, as total compensation for all gas purchased and taken under the terms of the agreement, in each month, a price per MMBtu equal to that price at which Buyer, in Buyer's sole judgment, can effectively market gas from Buyer's intrastate pipeline system after taking into account all reasonably incurred, or governmentally approved, transportation charges, including the transportation charge on buyer's pipeline system to secure delivery of the gas from the wellhead to Buyer's market....

Rec. vol. II (Attachment to Brief in Support of Kaiser–Francis Oil Company's Motion for Partial Summary Judgment—Letter from PGC to Kaiser-Francis dated March 30, 1983, at 2).

clear that it would not take-or-pay for any gas of Kaiser–Francis until Kaiser–Francis acceded to PGC's demands to renegotiate the contracts.[7]

PGC contends that whether Kaiser–Francis was entitled to suspend performance under § 2–609 [8] of the Oklahoma U.C.C. is a factual issue which should not be resolved by summary judgment. Specifically, PGC argues that whether Kaiser–Francis had reasonable grounds for insecurity and whether assurances made by PGC were adequate are inherently factual issues. If Kaiser–Francis had reasonable grounds for insecurity and the assurances offered by PGC were inadequate, Kaiser–Francis was entitled to suspend performance of the contract, including its right to cure the water vapor problem. Okla.Stat. Ann. tit. 12A, § 2–609(1).

■ We agree with PGC that normally whether a party has reasonable grounds for insecurity and the adequacy of any assurance offered are factual questions resolved with reference to commercial standards. *See* Okla.Stat.Ann. tit. 12A § 2–609(2) & comments 3 & 4 (West 1981). We also recognize, however, that to pre-

clude summary judgment on this issue, the evidence relied upon by PGC would have to be such that a rational trier of fact might conclude that Kaiser–Francis did not have reasonable grounds for insecurity and that PGC gave adequate assurance to Kaiser–Francis. *See Anderson,* 477 U.S. at 254, 106 S.Ct. at 2513. A rational trier of fact could not make such a conclusion.

■ PGC stopped performing on these take-or-pay contracts. The clear import of the documentary evidence on this point, much of it drafted by PGC, is that PGC had no intention of performing the contract unless Kaiser–Francis agreed to modify the take-or-pay provision. Kaiser–Francis was under no duty to agree. To be sure, PGC has provided an affidavit from one of its employees explaining its benign purpose in offering the amendments and further explaining that PGC never conditioned its performance upon Kaiser–Francis accepting those amendments. Rec. vol. I, doc. 40 (Keathley affidavit). However, this information, even when viewed in the light most favorable to PGC, is insufficient to preclude summary judgment on the insecurity issue for at least two reasons. First, it is

---

7. PGC wrote Kaiser–Francis that:
PGC is willing to take all of Kaiser–Francis' proportionate share of produced natural gas, ratably with other producers on PGC's system, upon acceptance by Kaiser–Francis of a price necessary to create a market demand for the commodity offered. However, as PGC also set forth, **PGC will not take any gas that does not comport to those certain conditions necessary to create and/or meet market demands.** Due to the failure of demand from PGC's existing markets, these conditions are required to permit PGC to create a market for PGC's gas by meeting the competitive prices of alternate fuels. Since Kaiser–Francis has, as of this date, refused to accept the conditions set forth in these letters, or negotiate similar conditions, PGC took no Kaiser–Francis gas in May and requested and received only that gas which was available from those producer's [sic] who had accepted the conditions offered by PGC. Accordingly, PGC owes no monies to Kaiser–Francis for the month of May, 1983, and will not purchase the interest of Kaiser–Francis in any subsequent month until Kaiser–Francis agrees to meet those conditions necessary for PGC to create and maintain a market for the product offered.
Rec. vol. I, doc. 40 (letter from PGC to Kaiser–Francis dated June 27, 1983) (emphasis added).

8. Okla.Stat.Ann. tit. 12A (West 1981) provides:
**§ 2–609. Right to Adequate Assurance of Performance**
(1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.
(2) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.
(3) Acceptance of any improper delivery or payment does not prejudice the aggrieved party's right to demand adequate assurance of future performance.
(4) After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.

based on PGC's erroneous interpretation of what constituted proper performance under the contract. The information does not address honoring the contracts as we interpret them. Second, PGC's refusal to pay for gas taken and for certain quantities not taken, while repeatedly trying to amend the contracts, could not fail to create reasonable grounds for insecurity.

Likewise, PGC did not provide adequate assurance that it would perform if Kaiser–Francis reduced the water vapor in the gas. To the contrary, PGC indicated it would perform only if the contract was amended. PGC's interpretation of the take-or-pay provision in the contract was erroneous and assured Kaiser–Francis that PGC would *not* perform absent contract modification. Indeed, PGC did not perform. The evidence is so one-sided on these points that no rational trier of fact could have found otherwise, even crediting PGC's evidence. *See id.* at 252, 255, 106 S.Ct. at 2512, 2513–14. Kaiser–Francis had reasonable grounds for insecurity, and the purported assurance offered by PGC was inadequate. Thus, summary judgment against PGC on the water vapor defense was proper.

### III.

PGC next argues that the district court erred in finding PGC was obligated to pay Kaiser–Francis for gas purchased from co-owners. Kaiser–Francis maintains that it is entitled to payment, at the contract price, for gas taken from wells covered by the contract. The amount of payment should be based on the percentage ownership in the wells held by Kaiser–Francis. The district court agreed with Kaiser–Francis. So do we.

To the extent that PGC's argument depends upon the premise that PGC had a contractual right to suspend performance, we have rejected that premise above. To accept PGC's other argument, that it is purchasing gas only from other co-owners in the well, and not Kaiser–Francis, is contrary to the intent of the contracts as would be commonly understood by both parties. Paragraph 11.1 of the contracts is clear that Kaiser–Francis is entitled to pay-ment within a specific time for gas delivered to PGC by Kaiser–Francis. Exhibit A to each contract indicated that Kaiser–Francis owned a percentage interest in each well, not one hundred percent. PGC cannot ignore its contractual obligations to Kaiser–Francis under the guise of purchasing gas only from other co-owners of the well who have agreed to PGC's reduced, negotiated price.

PGC refers us to the common law and the operating agreements between co-owners of the jointly owned wells, and argues that the co-owners of the wells had the right to sell one hundred percent of the gas to PGC (no doubt at the reduced, negotiated price), if Kaiser–Francis was unable to market its proportionate share of the gas. PGC then suggests that Kaiser–Francis must look to future production from the reservoir or rely on traditional gas balancing remedies for payment. The district court attributed any imbalance in this situation to PGC's breach of contract and also rejected the balancing solutions offered by PGC. Rec. vol. I, doc. 59 at 6–8.

Cash balancing, which results in the overproduced party (here, a co-owner) compensating the underproduced party (here, Kaiser–Francis) in cash, is done at the price the overproduced party received for the gas. Thus, to the extent a co-owner sold PGC the gas for a price less than the price contained in the PGC/Kaiser–Francis contract, Kaiser–Francis would receive the lower price, not the contract price it bargained for. If the cash balancing were done upon reservoir depletion, rather than on a periodic basis, Kaiser–Francis would incur the additional risk that an overproduced party might be unable to meet his cash balancing obligations at some indefinite date in the future. If the cash balancing were done on a periodic basis, Kaiser–Francis would still not receive its contract price at delivery for the gas.

Balancing in kind, when the underproduced party takes a certain increased percentage of the overproduced party's gas until the imbalance is eliminated, requires that a reservoir not be depleted. *See Beren v. Harper Oil Co.*, 546 P.2d 1356, 1359

(Okla.App.1975)[9] (discussing balancing in-kind). Practically, it offers no solution here because PGC will not purchase gas from Kaiser–Francis if it can purchase the same gas from the co-owners of the well who have accepted a reduced price. We agree with the district court that PGC "is currently depleting the wells under the theory that it is only depleting the gas reserves of other joint interest owners." Rec. vol. I, doc. 59 at 8.

PGC disclaims any responsibility for the imbalance created under its theory and suggests that the working interest owners should be left to resolve any situation where balancing is necessary. *See HBOP, Ltd. v. Delhi Gas Pipeline Corp.,* 645 P.2d 1042, 1045–46 n. 3 (Okla.App.1982).[10] The cases relied upon by PGC concern split-stream connections, where different purchasers buy from the same well. Although some of the wells here are split-stream connections, that is not the problem. PGC is creating an ostensible imbalance by not paying Kaiser–Francis for gas taken. On the underpayment claim, Kaiser–Francis merely seeks payment for gas taken in accordance with the contract. We reject PGC's attempt to recast this dispute as one between the joint owners of the wells, instead of one between PGC and one of those owners, Kaiser–Francis. Given its contracts with PGC, Kaiser–Francis need not resort to balancing which would alter 1) the price paid, 2) the time payment is made, and 3) the likelihood that payment would ever be made.

### IV.

Finally, PGC challenges the district court's decision that take-or-pay payments are not for gas already taken, and therefore that such payments do not result in prices for natural gas which exceed NGPA ceilings. *See* 15 U.S.C. § 3314(b)(1). The Federal Energy Regulatory Commission (FERC) recently rejected the same position advanced by PGC and stated:

> In the context of the gas purchase contract and industry practice, the take-or-pay payment is not intended to be a payment for gas and is not a part of the price of gas until it is applied at the time of sale. The value to the producer of take-or-pay payments forfeited by the purchaser is therefore not treated as part of the price of gas purchased currently.

*ANR Pipeline Co. v. Wagner & Brown,* 44 FERC ¶ 61,057 at 61,158 (1988). *See also Diamond Shamrock Explor. Co. v. Hodel,* 853 F.2d 1159, 1167–68 (5th Cir.1988) (take-or-pay payments are not payments for the sale of gas). The district court correctly decided this issue.

AFFIRMED.

---

9. An opinion released for publication by the Oklahoma Court of Appeals does not have precedential effect on the state courts in Oklahoma, but "may be considered persuasive." Okla.R. App.P.Civ. 1.200(C), (B), in Oklahoma Court Rules and Procedure at 658–59 (West 1989); *see* *also* Okla.Stat.Ann. tit. 20, § 30.5 (West 1981 & 1989 Supp.); *O'Neil v. Great Plains Women's Clinic, Inc.,* 759 F.2d 787, 789–90 (10th Cir. 1985).

10. *See* n. 9, *supra.*