**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**January 17, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

HARVEST GROUP, LLC,

    Plaintiff Counter-Defendant -
Appellant,

v.

LOVE'S TRAVEL STOPS & COUNTRY
STORES, INC.; MUSKET
CORPORATION,

    Defendant Counterclaimants -
Appellees.

No. 22-6170

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:20-CV-00435-C)**
_____

Gerard Michael D'Emilio, GableGotwals, Oklahoma City, Oklahoma (Rob F. Robertson, and Ashlyn M. Smith, GableGotwals, Oklahoma City, Oklahoma; and Amelia A. Fogleman, GableGotwals, Tulsa, Oklahoma, with him on the briefs), for Plaintiff Counter-Defendant - Appellant.

Peter S. Wahby, Greenberg Traurig, LLP, Dallas, Texas (Jesse W. Wainwright, Greenberg Traurig, LLP, Austin, Texas; and Allison M. Stewart, Greenberg Traurig, LLP, Dallas, Texas, with him on the briefs), for Defendant Counterclaimants - Appellees.
_____

Before **HARTZ**, **TYMKOVICH**, and **PHILLIPS**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

Harvest Group, LLC (Harvest) appeals from the summary judgment granted by the United States District Court for the Western District of Oklahoma in favor of defendants Love's Travel Stops & Country Stores, Inc. and Musket Corp. (collectively, Love's)[1] on Harvest's breach-of-contract claim. Harvest helps other businesses acquire "economic development incentives" offered by federal, state, and local governments as inducements to attract business. Aplt. App., Vol. 3 at 425. Love's entered into a contract with Harvest (the Agreement) for its help in procuring incentives related to the development of a renewable diesel facility (the Project) to be constructed in the City of Hastings in Adams County, Nebraska. In exchange, Harvest would earn a fee of 10% of the "net present value" of any "incentives/benefits" for the Project that it helped Love's acquire and Love's chose to utilize. *Id.* at 426.

The parties' dispute on appeal arises primarily from a favorable property-tax assessment (the Assessment) for the Project which greatly reduced its estimated tax burden below internal estimates originally produced by Love's. The Assessment was issued by the Adams County tax assessor after members of Harvest, with approval from Love's, met with city and county officials, including the assessor. Harvest alleges the Assessment was an incentive/benefit within the meaning of the Agreement, and thus one for which it is owed a fee. Love's argues in response (1) that the Assessment was not an "incentive" within the meaning of the Agreement;

---

[1] Musket is affiliated with, and controlled by, Love's. For purposes of this appeal, their existence as separate corporate entities is immaterial.

2

and (2) that in any event it was not the product of Harvest's efforts but simply the result of the assessor's straightforward application of Nebraska tax law. The parties also dispute whether Harvest is owed interest and whether Harvest was the "prevailing party" below and thus was owed attorney fees.

We have jurisdiction under 28 U.S.C. § 1291 over the appeal of this diversity action originally brought under 28 U.S.C. § 1332. Because we reject Love's argument that the Assessment was not an "incentive/benefit" under the Agreement and agree with Harvest that there are genuine disputes of material fact about whether the Assessment was the product of Harvest's efforts, we reverse the district court's grant of summary judgment to Love's on those issues. Those same factual disputes require us to affirm the district court's denial of Harvest's motion for summary judgment. We also reverse the district court on the issues of Harvest's entitlement to interest and whether Harvest was the prevailing party below. We remand for further proceedings.

## I.      BACKGROUND

### A.      Factual Background

Most of the relevant facts are undisputed. Where different inferences can be drawn from the evidence, we review matters in the light most favorable to the party opposing summary judgment. *See Huff v. Reeves*, 996 F.3d 1082, 1085 (10th Cir. 2021) ("At the summary judgment stage, the court may not weigh evidence and must resolve genuine disputes of material fact in favor of the nonmoving party." (ellipsis and internal quotation marks omitted)).

3

Harvest, operated by its founders Norman Wesley Bowen and Rudy Watkins,

helps businesses obtain "economic development incentives." Aplt. App., Vol. 3 at

425. In September 2018 Harvest entered into the Agreement with Love's, under

which it would help Love's obtain incentives for developing a tire retread facility in

Tennessee (unrelated to this dispute) in exchange for 10% of the value of the

"incentives/benefits" Love's chose to pursue. *Id.* at 426. The following month, the

parties added a new potential project to the Agreement, whereby Harvest would help

Love's obtain economic development incentives related to the Project in Nebraska in

exchange for the same 10% fee. Neither party disputes the validity of the

Agreement.[2]

---

[2] In relevant part the Agreement states as follows:

Harvest has developed an expertise in identifying and maximizing
various economic development incentives that may be applicable to
Love's current operations, future business strategies, and anticipated
capital needs. These incentives, offered and administered by federal, state
and local governmental agencies, are typically provided in exchange for
Love's commitment to conduct economically beneficial activities at a
designated location. For example, incentives may be available in
exchange for Love's commitment to make new capital investment, create
or retain jobs, or continue business operations at a location.

Incentives come in the form of cash grants, land grants or preferential
land-use terms, payment for infrastructure improvements, utility rate
reductions, property tax reductions or abatements, income tax reductions
or exemptions, sales or use tax reductions or exemptions, tax-increment
financing, tax credits, payment for job training or employee screening
assistance, wage rebates, low-cost financing, forgivable loans, or other
various federal, state and local incentives.

As and when requested by Love's, Harvest agrees to use its best efforts to provide to Love's the following Services to actively manage federal, state and local incentives:

- Identify potential incentive-generating Love's projects or activities,
- Create an economic development strategy for such projects or activities,
- Analyze potential incentives for a particular project or location,
- Initiate and develop relationships with appropriate granting authorities,
- Negotiate and obtain incentive offers from the various granting authorities,
- Advise on information release to maintain incentive leverage,
- Provide an incentive presentation binder (an "IPB") for each project to Love's which shall include:
  - A summary of each incentive related to the project,
  - A detailed description of each incentive including:
    - Supporting descriptions, documentation, and values,
    - Description of legal documentation or processes, if any, that will be required in order to utilize the incentive,
- Manage the consummation of incentive agreements, processes, and/or incentive documentation,
- Manage the project's incentive compliance for the first year.

Each Love's location or project will be unique, requiring more or less services that those specifically listed above. The scope of services will be limited to those projects further agreed to in Exhibit A, and/or other written communication, as directed by an authorized representative of Love's.

Notwithstanding anything contained herein to the contrary, Love's acknowledges and agrees that the Services may include advice, opinions or recommendations as to which incentives and benefits may be obtained, but all decisions in connection with the adoption or implementation of any such advice, opinions or recommendations shall be made by, and are the responsibility of Love's. Love's shall have the sole authority and sole discretion to elect and approve all federal, state and local incentive programs. Love's may, in its sole discretion, reject any proposed incentive and is under no obligation to close any incentive transaction or

5

From October 2018 to August 2019, Harvest met with numerous state and local officials on behalf of Love's, obtaining millions of dollars' worth of economic-development incentives for the Project. In August 2019 Love's received from its contractor an estimated construction cost for the facility of $298,500,073. Love's tax department determined that 94% of the building components would be classified as

---

enter into any incentive program. Only the incentives Love's chooses to utilize will be included in the IPB.

**Fee Arrangement**
Harvest's fees shall be comprised of the following:
- Negotiation Fee of ten percent (10%) of the mutually agreed upon anticipated utilization of incentives/benefits approved for pursuit by Love's included in the Incentive Presentation Binder.
  - Negotiation Fee shall be due upon Love's receipt of the Incentives Presentation Binder from Harvest. The Incentives Presentation Binder will only include incentives Love's chooses to utilize. . . .
  - Fee amounts are not subject to adjustment based on Love's subsequent sale, abandonment, restructuring, change in business activity, or other contingencies that may have a positive or negative effect on the incentives/benefits. . . .

**Assumptions and Limiting Conditions**
 . . . Harvest will rely upon Love's for the accuracy and completeness of Love's records, as well as, all other information, estimates, and projections supplied. . . .

**Miscellaneous**
. . . If either party institutes legal action to enforce its rights under this Agreement, the prevailing party will be entitled to recover its reasonable attorneys' fees and other costs so incurred. . . . Any portion of a fee or expense not paid to Harvest when due will bear interest from the due date until paid at the legal rate of 10% per annum. . . .

Aplt. App., Vol. 3 at 425–28.

real property and 6% as personal property. Any personal property at the Project would be exempt for 10 years from property taxes under a separate "Nebraska Advantage" incentive obtained by Harvest. Love's internal tax analysis estimated that property taxes for the Project would amount to $5 million a year. These tax calculations were provided to Harvest. Kris Rogers, the tax director at Love's, and Spencer Haines, Love's Chief Financial Officer, both communicated to Harvest that they felt the estimated property-tax burden was "too high" for the project to be attractive. *Id.*, Vol. 4 at 635.

Harvest formulated a "novel and unique" strategy to deal with this property-tax burden. *Id.* at 634 (Bowen declaration). It proposed to "resolve the high tax estimate by meeting with the assessor before the project was announced while the community was still vying for the project." *Id.* This approach was novel because "most large corporations"—including Love's—"simply build their facilities, report the assets to the Assessor as they have internally classified them, and then challenge the value and segregation of assets with the assessor at a later date often with the help of a firm specializing in property tax negotiations." *Id.* Harvest's strategy included (1) reducing the overall value of the Project by "excluding certain costs for property tax purposes" and (2) segregating assets with the tax assessor in a "pre-construction conference" to reduce the percentage of assets classified as real property by classifying them as personal property. *Id.*

On September 18, 2019, Bowen had a telephone call with the mayor of Hastings. Bowen told the mayor that Harvest "was aware" that the county tax

assessor, Ms. Jackie Russell, had discretion in applying the tax code to the valuation and segregation of assets. *Id.* He asked if the mayor would call the tax assessor to see if she would be willing to meet with Harvest "to determine if we could devalue the project and segregate assets deemed as real property by Love's to personal property in order to create an environment with a more palatable estimated property tax liability for our client." *Id.* Bowen said in reference to this conversation with the mayor that "[a]chieving a lower property tax estimate represented an important inducement opportunity for the County in order for Love's to make the investment" in the Project. *Id.* at 634–35.

Late that afternoon, assessor Russell sent Bowen an email responding to his questions about Nebraska real- and personal-property tax law, saying that she was "finding it really hard to process the fact that you would not have a lot of personal property value in this project." *Id.*, Vol. 5 at 911.

The next day, Bowen and Watkins had a conference call with executives from Love's, including Haines and Samuel Crites, General Manager of Business Development at Musket. Haines brought up the property-tax issue and said that "he felt there was an opportunity to reduce the property taxes by Harvest negotiating a reduced value with the Adams County Tax Assessor." *Id.*, Vol. 4 at 666 (Crites declaration). After Harvest explained its tax strategy, Haines "said that [Love's] would normally pay whatever is assessed for ten years and then challenge the classification, but Harvest's approach [was] better." *Id.* He "enthusiastically approved Harvest's plan." *Id.* at 635 (Bowen declaration).

During the call Bowen told Haines that Harvest "had already begun to use the leverage it had," the leverage being that "local officials wanted this facility and its economic benefits to come to Adams County and [the officials had been] told by Mr. Bowen that absent property tax relief, the facility might well never be built." *Id.* at 666 (Crites declaration). Bowen said that a meeting had already been set up with himself, Adams County tax assessor Russell, and other city and county officials "in an effort to get the property taxes lowered" from Love's $5 million-a-year estimate. *Id.* Haines "agreed that this Harvest Group plan was sound, agreed that the next day's meeting should go forward as planned, and wished Harvest Group well at the meeting." *Id.* After the call Crites pointed out to Haines that if Harvest was successful at the meeting with the tax assessor, its fees would be increased. Haines responded that "the benefits gained would be worth the fees paid for this gain; that he did not mind paying for added value for the company." *Id.*

A meeting on September 20 was attended by Harvest members Bowen and Watkins, assessor Russell, the mayor, the city attorney, and the Hastings economic development director; no one from Love's was present. Bowen provided the following account: The attendees "discussed the importance of the project to the local community and the issue of Love's perception that the property tax estimates were too high." *Id.* at 635 (Bowen declaration). The parties then reviewed the Project's construction budget "line item by line item." *Id.* According to Bowen, "both Harvest and the assessor worked to exclude as many costs as possible from the valuation and to segregate as many of the assets as possible from real property to personal property

9

by utilizing the assessor's latitude inherent in the broad statutory definitions of real property, personal property and trade fixtures." *Id.* at 635–36. In addition, the parties discussed how certain "line items should be removed altogether from Love's property tax calculations." *Id.* at 636. Bowen kept in a spreadsheet a record of each line item discussed and sent a copy to Russell after the meeting.

Russell then drafted a letter (the Classification Letter) to Love's including the spreadsheet from the meeting and explaining that the spreadsheet was "discussed and developed based on your initial pro forma information along with my determined classifications for the project descriptions." *Id.*, Vol. 3 at 581. According to Bowen, the letter was to "address Love's concerns that property taxes would be too high if the project were to locate in Adams County." *Id.*, Vol. 4 at 636. Russell sent it to Bowen for review "to ensure it was worded correctly to accomplish its intended purpose of inducing Love's to locate [the Project] in Adams County, NE," and then "after [Bowen's] approval of her wording she sent it to [Love's]." *Id.* The spreadsheet sent by Russell showed that the cost of the property was now listed at $208,576,223 (a reduction of almost $90 million from Love's estimated valuation) while 19% of the Project was classified as real property and 81% as personal property (compared to Love's estimate that 94% was real property and 6% personal property).

Russell provided her own account of how she arrived at the property-tax classifications and what happened at the meeting. According to Russell, after reviewing the property to be used for the Project, she "discussed [her] findings and

conclusions about [the Project] property classification with Harvest" at the meeting. *Id.*, Vol. 3 at 585 (Russell declaration). "Based on [her] review of [the Project], [her] experience as a County assessor, and applicable Nebraska law . . . , [she] determined the property should be classified" as described in the spreadsheet.[3] *Id.* Russell later gave the following explanation of her classification of the property:

> The Classification Letter I sent to Love's contained the first and only classification that I performed for [the Project].
> The classification contained in the Classification Letter was not a "reclassification" as there was no previous (or "original") classification made but the result of my experience classifying property as a County assessor, my assessment of the property for [the Project], and a straight-forward application of Nebraska law.
> The classifications in the Classification Letter were neither the result of any negotiations or agreed-upon change in approach to the property classification with any private party, nor a resolution of any dispute over the classification of the property.
> Property classifications, like the one I prepared in the Classification Letter do not constitute an abatement, a grant, a tax reduction, a rate reduction, a credit, a rebate, or any other incentive.

*Id.* at 586 (paragraph numbering omitted).

Later on the day of the meeting with Russell, Bowen emailed Love's, reporting that the meeting "went extremely well" and that "[w]e are down to $208MM on valuation and we are at 19% real property and 81% personal property. Needless to say, this is a huge victory." *Id.*, Vol. 5 at 921. Two members of Love's management

---

[3] Russell's declaration uses a total value of the Project of $298,500,073, the same as Love's initial estimates. In the spreadsheet she sent to Love's, however, the Project is valued at $208,576,223. There is no explanation for this discrepancy, which we assume was an inadvertent error in the declaration.

responded, "Excellent news !!!" and "Kaboom!!" *Id.* Others were "thrilled" and "very pleased" with the news. *Id.*, Vol. 4 at 637, 665.

Having completed work on the final incentive/benefit, on September 22 Harvest sent Love's an "update[d] utilization schedule," on which its fee would be based. *Id.*, Vol. 5 at 954. But payment of Harvest's fee did not go smoothly.

Early in his tenure, Haines had indicated an intention to take a tough line in paying Harvest. He joined Love's as Chief Financial Officer in August 2019. According to Crites, during the first briefing of Haines on the Project, before Harvest had met with Russell, Haines and others in Love's management were looking to cut Harvest's fees. Haines stated that he thought Harvest was "being paid too much," that he "was the new sheriff in town," that people like Bowen and Watkins were "a dime a dozen," and that he intended to cut Harvest's fee in half. *Id.*, Vol.4 at 666 (Crites declaration). When Crites advocated that "Harvest be paid in full, now, as called for by the contract," another high-level executive replied that "They are like whores: use them, abuse them, pass them on." *Id.* Although on later occasions Haines (1) expressed pleasure at the excellent results Harvest had obtained on incentives other than the property-tax adjustment, (2) told Crites that "he did not mind paying for added value to the company," *id.*, and (3) in an internal December 2019 email said that he "might have given [Harvest] the benefit of some of the lower real estate taxes on this deal since they were able to renegotiate," *id.*, Vol. 6 at 1310, he also expressed a desire to pay Harvest as little as possible. A Love's employee recounted in an internal email that Haines had told him in a discussion of Harvest's fee

12

schedule that Haines wanted to "be creative" on "discounting stuff." *Id.*, Vol. 5 at 957. And in January 2020, after a Love's employee reported giving Harvest a lower fee number, Haines replied in an email, "Good response . . . keep pushing on fee like you did [here]." *Id.* at 962 (ellipsis in original).

After months of negotiation, on February 12, 2020, Haines sent a response to a recently updated version of Harvest's utilization schedule. His email stated that Love's only adjustment was to the "realization of the *benefit* related to property taxes" because the "*benefit* [would] not actually start to be realized" until 2023; but he then "added an additional year on the back end." *Id.* at 940 (emphasis added). He concluded, "Of course, both Love's and Harvest will need an opportunity to take a last look at these numbers if Love's decides to move forward with [the Project]." *Id.* The schedule sent by Haines, which is in a table format, included two categories of "Project Incentives": (1) "Property Taxes" and (2) "Other Incentives." *Id.* at 946. The total present value (using a 6% discount rate) of the property-tax and other-incentives benefits was $73,723,000. A week later, Harvest agreed to the schedule and sent an invoice for 10% of the value of the benefits, or $7,372,300.

When Love's had not paid anything by March 2020, Harvest sent an "Incentive Presentation Binder" (IPB) for the Project to Love's, who received it on March 25, 2020. The IPB included the Project Incentives table sent by Haines and the Classification Letter spreadsheet used by Russell. After Love's still had not paid anything by April 9, 2020, Harvest's lawyer sent an email insisting that Love's pay Harvest's fee. In addition, Harvest's lawyer noted that there was an error in the fee

calculation, and that the correct amount owed was $7,494,910, although he said that Harvest was willing to settle for the lower fee amount if paid by April 30, 2020. Harvest filed suit on May 11. Love's did not pay by that date on the ground that it did not have to pay until it had "moved forward" on the Project and had begun to utilize the incentives, and at that point Love's had not yet done so. *Id.*, Vol. 3 at 565 (Haines declaration).

On April 20, 2021, Love's announced a joint venture with a third party to move forward with the Project. On May 19, a year into litigation, Love's asserted for the first time that the property-tax classification was not an incentive for which it had to pay Harvest a fee. On June 2, Love's paid Harvest $3,948,954, which was Harvest's original fee calculation less the fee demanded by Harvest for the value of the disputed property-tax benefit.

### B.     Procedural History

In its first answer and counterclaim, filed July 13, 2020, Love's argued both that the contract was unenforceable and that Harvest was owed no fee until Love's made a final decision on whether to proceed with the Project. Love's later abandoned its argument that the contract was invalid in exchange for Harvest's dropping a quantum meruit argument it had been advancing. On June 15, 2021, Love's filed an amended answer and counterclaim which pleaded for the first time the contention that Harvest was not entitled to a fee based on the Assessment "because it is not an incentive under the Agreement." *Id.* at 377.

14

Both parties moved for summary judgment in the district court. The court granted Love's motion and denied Harvest's. As relevant to the issues on appeal, the court ruled as follows: (1) The Assessment was not an incentive/benefit within the meaning of the contract. The court ruled that "any change in the classification of the property as a result of the efforts of [Harvest], and which altered the tax due, is an incentive under the terms of the Agreement." *Harvest Grp., LLC v. Love's Travel Stops & Country Stores, Inc.*, No. CIV-20-435-C, 2022 WL 4361745, at *3 (W.D. Okla. Sept. 20, 2022). But it agreed with Love's that the tax classification "was not the result of any action of [Harvest] but merely the result of the Assessor applying the applicable law," and thus "cannot be considered a benefit under the Agreement." *Id.* (2) Under the terms of the contract, payment was due upon proper presentation of the IPB, contrary to Love's argument that payment was not due until Love's in fact began to utilize the incentives. But because the Assessment was not an incentive/benefit under the terms of the contract, the IPB (which claimed the Assessment as an incentive/benefit) was not properly presented by Harvest on March 25, 2020, so payment was not due at that time. (3) Because Harvest was not the prevailing party, it was not entitled to interest or attorney fees.

On appeal Harvest argues, both in opposition to Love's motion for summary judgment and in support of its own motion for summary judgment, that the Assessment was an incentive/benefit under the Agreement; that payment was due Harvest on March 25, 2020 (the date Harvest presented the IBP to Love's), so it is owed interest calculated from that date; and that Harvest was a prevailing party

15

entitled to attorney fees even if the Assessment was not an incentive/benefit under the Agreement.

## II.     ANALYSIS

"We review de novo the district court's grant of summary judgment, applying the same legal standards that govern the district court." *Alfaro-Huitron v. Cervantes Agribusiness*, 982 F.3d 1242, 1249 (10th Cir. 2020). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way, and it is material if under the substantive law it is essential to the proper disposition of the claim." *Alfaro-Huitron*, 982 F.3d at 1249 (internal quotation marks omitted). "We construe the factual record and the reasonable inferences therefrom in the light most favorable to the nonmoving party." *Id.* (internal quotation marks omitted).

As this is a diversity matter, we "must apply the substantive law of the forum state, including its choice of law provisions." *Devery Implement Co. v. J.I. Case Co.*, 944 F.2d 724, 727 (10th Cir. 1991). Unless contrary to its public policy, Oklahoma enforces choice-of-law provisions in a contract if the dispute has a sufficient nexus with the state whose law is chosen. *See Berry & Berry Acquisitions, LLC v. BFN Props. LLC*, 416 P.3d 1061, 1068–69 (Okla. 2018) ("Parties to a contract are free to specify the rules by which a contract will be enforced, including specification of the law of a particular jurisdiction."). The Agreement contained a choice-of-law

16

provision stating that Oklahoma law would govern the contract, and neither party disputes that Oklahoma law applies. Therefore, "[c]onsistent with the choice of law provision in [the] contract, we apply Oklahoma substantive law." *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).

### A.    Principles of Oklahoma Contract Law

In Oklahoma, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties, as it existed at the time of contracting, so far as the same is ascertainable and lawful." Okla. Stat. Ann. tit. 15 § 152. "If a contract is complete in itself and viewed in its entirety is unambiguous, its language is the only legitimate evidence of what the parties intended," and courts should not "create an ambiguity by using a forced or strained construction, by taking a provision out of context, or by narrowly focusing on the provision." *Patel v. Tulsa Pain Consultants, Inc., P.C.*, 511 P.3d 1059, 1062 (Okla. 2022) (internal quotation marks omitted). "Unless some technical term is used in a manner meant to convey a specific technical concept, language in a contract is given its plain and ordinary meaning." *K & K Food Servs., Inc. v. S & H, Inc.*, 3 P.3d 705, 708 (Okla. 2000).

"The interpretation of a contract, and whether it is ambiguous is a matter of law" to be resolved by the courts. *Patel*, 511 P.3d at 1062 (internal quotation marks omitted). "A contract is ambiguous if it is reasonably susceptible to at least two different interpretations." *M.J. Lee Const. Co. v. Oklahoma Transp. Auth.*, 125 P.3d 1205, 1213 (Okla. 2005) (internal quotation marks omitted). "The mere fact the parties disagree or press for a different construction does not make an agreement

17

ambiguous." *Pitco Prod. Co. v. Chaparral Energy, Inc.*, 63 P.3d 541, 545 (Okla. 2003). Moreover, "ambiguity in written language is not created by the conduct of one of the parties to a contract." *Hensley v. State Farm Fire & Cas. Co.*, 398 P.3d 11, 23 (Okla. 2017).

The presence of ambiguity "allows for the conduct of the parties to be used to determine the meaning of the contract." *Id.*; *see Rush v. Champlin Ref. Co.*, 357 P.2d 984, 986 (Okla. 1960) ("It is a well-settled rule that where the meaning of the terms used in a written contract are not clear, the subsequent acts of the parties, showing the construction they have put upon the agreement themselves, are to be looked to by the court." (internal quotation marks omitted)). Indeed, where "a contract is susceptible to more than one interpretation, the construction given the contract by the actions of the parties will be given great weight." *Pierce Couch Hendrickson Baysinger & Green v. Freede*, 936 P.2d 906, 912 (Okla. 1997).

### B. The Property Tax Assessment

The principal issue on appeal is whether Harvest is entitled to compensation for its work on the Assessment, which it claims saved Love's millions of dollars in future property taxes. We begin by reviewing the applicable provisions of the Agreement.

The "Fee Arrangement" provision states that Harvest's fees shall include a "Negotiation Fee of ten percent (10%) of the mutually agreed upon anticipated utilization of incentives/benefits approved for pursuit by Love's included in the Incentive Presentation Binder." Aplt. App., Vol. 3 at 426. The Agreement does not

define or describe what is meant by *benefits*. It also does not define *incentives*, although it illustrates the term as follows:

> Incentives come in the form of cash grants, land grants or preferential land-use terms, payment for infrastructure improvements, utility rate reductions, property tax reductions or abatements, income tax reductions or exemptions, sales or use tax reductions or exemptions, tax-increment financing, tax credits, payment for job training or employee screening assistance, wage rebates, low-cost financing, forgivable loans, or other various federal, state and local incentives.

*Id.* at 425.

Love's contends that it owes nothing to Harvest for the Assessment for two independently sufficient reasons: (1) the decision by assessor Russell regarding the real- and personal-property evaluations for the Project was not an "incentive," and (2) Harvest did not earn a fee with respect to those evaluations because they were determined by Russell strictly as a matter of law, without any exercise of discretion. We disagree with the first reason and think that there are genuine disputes of material fact precluding summary judgment (for either party) on the second.

Love's first argues that Harvest is not owed a fee for the value of assessor Russell's classification of Project property because the Agreement defines *incentive* to exclude "property tax classifications." Aplee. Br. at 4–5. We read the Agreement otherwise. To begin with, Love's argument ignores that the Agreement bases the fee on "incentives/benefits," not just "incentives." In addition, the Agreement does not define the term *incentives*. The paragraph quoted above provides illustrations, not a definition. It would be a peculiar definition of *incentives* that ends with the circular language "or other various federal, state and local incentives." Aplt. App., Vol. 3 at

19

425. And even if the paragraph were treated as a definition, we fail to see why the absence of the language "property tax classifications" in the paragraph implies that such a classification would not be an incentive. The paragraph includes "property tax reductions" as an example of an incentive, and surely a reduction could be accomplished by changing the classification of the property.

More generally, Love's argues that Russell's classification could not be an incentive because there was no change from an earlier official assessment of the property. It interprets "property tax reductions or abatements" to "require there to be some change—a reduction or an abatement—to Love's tax liability," and therefore claims the Assessment was not an incentive because there was no original determination of the Project's tax status that was altered by the Assessment. Aplee. Br. at 25. But when, as here, a company is considering incentives from local governments to decide whether to start business in a community, it hardly expects the local governments to first impose a tax liability (on, say, a nonexistent structure) before making a better offer. The government's initial offer may simply be better than what the company, likely based on internal calculations, had expected. Why would the company not be pleased with, and willing to pay a consultant for, a government "offer" that was better than it anticipated? Of course, there must be some baseline to measure the amount of the incentive in determining what Harvest's fee would be, and that could be the subject of a reasonable dispute; but at least one possible reasonable baseline in this case is Love's initial internal analysis of the classification and value of the Project's property. Love's reading of the Agreement

20

proves too much, for it would prevent Harvest from receiving a fee for obtaining a favorable tax classification even when (as did not happen here) government officials *explicitly* offered the classification as an incentive to attract Love's business. We can find nothing in the Agreement that would exclude such an obvious incentive or benefit from the fee provision.

Further, if there was any ambiguity regarding whether the Assessment could not be an incentive/benefit because there had not been a reduction or abatement of Love's established (official) tax liability, the undisputed facts regarding Love's response to the Assessment resolve that ambiguity in favor of Harvest. Love's executives communicated to Harvest that the property tax burden on the Project was "too high" to make it attractive. Aplt. App., Vol. 4 at 635 (Bowen declaration). Haines, Love's CFO, thought Harvest's approach to the Project's property taxes was "better" than Love's normal approach, *id.* at 666 (Crites declaration), and "enthusiastically approved" of Harvest's meeting with the city and county officials to reduce the Project's tax burden from Love's estimates, *id*. at 635. After the meeting at which Haines made these statements, Crites mentioned to Haines that if Harvest was successful in its meeting with the tax assessor, Harvest's fees would be increased, to which Haines responded that "he did not mind paying for added value to the company." *Id.* at 666. Finally, and definitively, Haines himself sent a fee schedule to Harvest which included fees based on the value of the Assessment, and his cover email referred to "the *benefit* related to property taxes." *Id.*, Vol. 5 at 940 (emphasis

added). Both parties to the Agreement clearly understood it to include the Assessment as an incentive/benefit.

Love's second argument against the portion of the fee based on the Assessment is that Harvest did not earn the fee because the property classifications were not the result of Harvest's efforts but were determined by Russell strictly as a matter of law, without any exercise of discretion. This argument raises factual issues that cannot be resolved on summary judgment in favor of either party.

Love's rests its argument on the declaration of assessor Russell, who insisted that her classification of the property was simply a proper application of the law, not the product of negotiation or dispute resolution. She said that her classification of the property was the result of her "experience classifying property as a County assessor, [her] assessment of the property for the [Project], and a straight-forward application of Nebraska law." *Id.*, Vol. 3 at 586. And she added what it was not the result of: "The classifications in the Classification Letter were neither the result of any negotiations or agreed-upon change in approach to the property classification with any private party, nor a resolution of any dispute over the classification of the property." *Id.* Love's asserts that this declaration is dispositive of the issue because it "blatantly contradicted" Harvest's contention that the Assessment was the result of its efforts, and therefore it was appropriate to grant summary judgment to Love's. Aplee. Br. at 30.

Russell's declaration is sufficient to preclude summary judgment in favor of Harvest on the issue, but not to support summary judgment in favor of Love's.

22

Love's blatant-contradiction argument misreads our law. It relies on our statement in *Janny v. Gamez* that "'[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" 8 F.4th 883, 901 (10th Cir. 2021) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). But *Scott*'s blatant-contradiction exception to the general summary-judgment standard is a "narrow" one. *Janny*, 8 F.4th at 901. This court "has generally limited application of the exception to cases involving objective documentary evidence, such as video recordings or photographs" and has "not extended the exception to circumstances in which the court is merely presented with two parties' conflicting testimonial accounts of the same events." *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1164–65 (10th Cir. 2021). The evidence that Love's claims "blatantly contradicts" Harvest's narrative is merely a statement by a percipient witness, the assessor Russell. Such evidence "simply do[es] not constitute the type of evidence that could satisfy" the blatant-contradiction exception. *Id.* at 1165.

The question, then, is whether there is any evidence supporting Harvest's contention that it contributed to a lower property-tax assessment for the Project. On this point, Love's again makes an argument contrary to long-established law. Love's protests that much of Harvest's evidence of what happened at the meeting between local officials and Harvest derives from the "self-serving opinions" of Bowen provided in his sworn statement. Aplee. Br. at 27. But "[s]o long as an affidavit is

23

based upon personal knowledge and sets forth facts that would be admissible in evidence, it is legally competent to oppose summary judgment, irrespective of its self-serving nature." *Janny*, 8 F.4th at 900 (internal quotation marks omitted). Whether a statement is self-serving may affect the weight given it by a jury; but whether the statement is to be believed is still a matter for the factfinder.

In our view, Harvest provided sufficient evidence to create a dispute of material fact about whether assessor Russell's classification was influenced by Harvest's efforts, and thus whether Harvest was owed a fee for obtaining it. This evidence paints a picture of something other than the mechanical application of law to the facts that is suggested by Russell's declaration. Rather, it suggests that the role of the assessor, in a room with nonexpert officials strongly interested in offering Love's as low a property-tax burden as possible, was to exercise her discretion under the law to be as accommodating as she could be in accepting suggestions and acting on her own initiative with a view to minimizing the property tax.

According to Bowen's sworn statement, he informed the mayor of Hastings that the assessor had discretion under the law "regarding the overall valuation and segregation of specific assets as real or personal property," and asked the mayor to call the assessor to see if she "would be willing to meet with [members of Harvest] to determine if we could devalue the project and segregate assets deemed as real property by Love's to personal property in order to create an environment with a more palatable estimated property tax liability." Aplt. App., Vol. 4 at 634. Bowen's declaration explained that "[a]chieving a lower property tax estimate represented an

important inducement opportunity" to attract Love's business, since executives at Love's had told him that "they felt the estimated local property tax burdens were too high." *Id.* at 634–35. According to Crites, Bowen told Haines that Harvest was "us[ing] the leverage" Love's had to obtain lower property taxes for the Project because "local officials wanted [the Project] and its economic benefits to come to Adams County and were told by Mr. Bowen that absent property tax relief, the facility might well never be built." *Id.* at 666.

According to Bowen, things then went according to plan. During the meeting with Russell, the mayor, the city attorney, and the city economic-development director, Bowen and the local officials "discussed the importance of the project to the local community and the issue of Love's perception that the property tax estimates were too high," before Bowen worked "line item by line item" with Russell "to exclude as many costs as possible from the valuation and to segregate as many of the assets as possible from real property to personal property by utilizing the assessor's latitude inherent in the broad statutory definitions of real property, personal property and trade fixtures." *Id.* at 635–36 (Bowen declaration). After the meeting Russell used Bowen's spreadsheet developed at the meeting to send a letter to Love's explaining her classification, but she first sent the letter for review to Bowen "to ensure it was worded correctly to accomplish its intended purpose of inducing Love's to locate [the Project] in Adams county." *Id.* at 636. Russell's letter explained to Love's that she had met with members of Harvest "regarding the classification of real property vers[u]s personal property as determined by the State of Nebraska" for the

25

Project, and that the property-tax-classification spreadsheet was "discussed and developed based on [Love's] initial pro forma information along with [her] determined classifications for the project descriptions." *Id.*, Vol. 3 at 581. This evidence would allow a reasonable jury to find that the Assessment was the result, at least in part, of Harvest's efforts.

Moreover, even if we fully credit Russell's declaration, it is not inconsistent with Harvest's making valuable contributions. Just as lawyers find and cite authority to courts, Harvest could have influenced Russell by pointing to laws or regulations or to decisions in other jurisdictions regarding how to classify or value property. (We note that Russell's declaration addresses only classification of property, yet the Assessment also *values* the property at much less than did Love's internal calculation.) And as we read the declaration, what Russell disclaims is any *bargaining* in arriving at the Assessment. But that leaves room for *persuasion* by Harvest. Although Russell declares that a component of her decision was "a straight-forward application of Nebraska law," *id.* at 586, she does not disclaim any exercise of discretion in resolving where a particular type of property fits in the regulatory scheme, and we doubt that she could. Love's seems to suggest that to say that Harvest influenced Russell would be to impugn her professional integrity. But we doubt that counsel for Love's would think they were impugning the integrity of the district judge in this case if they told their clients that they had influenced her to rule favorably in that court.

26

In sum, both parties proffered sufficient evidence at summary judgment to create a genuine dispute of material fact over whether the Assessment was the result, at least in part, of Harvest's efforts, entitling it to receive a fee based on the Assessment's value. Therefore, it was error to grant summary judgment for Love's on the issue of Harvest's fee for the Assessment. And by the same token, the district court ruled correctly in denying Harvest's motion for summary judgment on the issue.

### C.    Interest

Harvest also argues that it is due interest on its fee, to be calculated from March 25, 2020, the date on which Love's received the IPB including the disputed Assessment incentive/benefit. The relevant portions of the Agreement state:

> Harvest's fees shall be comprised of the following:
> - Negotiation Fee of ten percent (10%) of the mutually agreed upon anticipated utilization of incentives/benefits approved for pursuit by Love's included in the Incentive Presentation Binder.
>    - Negotiation Fee shall be due upon Love's receipt of the Incentives Presentation Binder from Harvest. The Incentives Presentation Binder will only include incentives Love's chooses to utilize.
>
> . . .
>
> Any portion of a fee or expense not paid to Harvest when due will bear interest from the due date until paid at the legal rate of 10% per annum.

*Id.* at 426, 428.

In district court Love's claimed that it had no obligation to pay until it decided to "move forward" with the Project, which was long after submission of the IPB. The district court rejected that argument, and Love's does not raise it again on appeal.

27

The district court did, however, rule for Love's on the interest issue, holding that Harvest was not due interest from the date of the presentation of the IPB because the Assessment presented in the IPB was not an incentive and the IPB was therefore not properly presented at that time.

Love's has now adopted the view of the district court, claiming that it did not need to pay until it received a proper IPB, that an IPB is not proper unless it includes only proper incentives, and that the submitted IPB was improper because the Assessment was not an incentive. Harvest contends that even if the Assessment was not an incentive, interest on what *was* owed still began accruing on the date of submission of the IPB, because the contract, while calling for the IPB to include only proper incentives, says nothing about the inclusion of non-incentives, so inclusion of one does not make the IPB improper. The issue of when interest would accrue if the Assessment was not an incentive/benefit was not, however, argued by the parties in district court. Since we have already decided that remand to the district court is necessary for resolution of whether the Assessment was an incentive, we also leave it for that court to decide the interest-accrual matter in the first instance if Love's prevails on the Assessment issue. If, on the other hand, it is determined that the Assessment was a proper incentive, then interest is due from the date of the submission of the IPB.

### D.    Attorney Fees and Prevailing-Party Status

The parties' agreement states that "[i]f either party institutes legal action to enforce its rights under this Agreement, the prevailing party will be entitled to

28

recover its reasonable attorneys' fees and other costs so incurred." *Id.* at 427. Presumably because the district court ruled against Harvest on the issue of its fee for the Assessment, it also ruled that "because the Court has determined [Harvest] is not the prevailing party, [Harvest]'s arguments [about attorney fees] are moot." *Harvest Grp.*, 2022 WL 4361745, at *4. Because we reverse the district court's summary-judgment order as to the Assessment fee, we also reverse its order on attorney fees, and remand the issue for further consideration in light of the ultimate resolution of the Assessment fee dispute.

## III.   CONCLUSION

We **AFFIRM** the denial of Harvest's motion for summary judgment and **REVERSE** the district court's summary-judgment orders (1) that Harvest was not owed a fee based on the value of the property-tax Assessment, (2) that Harvest was not owed interest from the date it presented the Incentive Presentation Binder in the event the Assessment is determined not to be an incentive/benefit, and (3) that Harvest was not a prevailing party, and **REMAND** for further proceedings on those issues.